## 32220. CORN v. THE STATE.

HALL, Justice.

Charles Thomas Corn was indicted in Clayton County for armed robbery and murder occurring on August 15, 1975. At a special sanity hearing a jury found him competent to stand trial, and he was convicted of both counts and sentenced to death for each offense.

The case is before this court on appeal and for mandatory review of the death penalty.

I. Summary of the Evidence

The state presented evidence from which the jury was authorized to find the following:

Two female friends of Mary Long, the victim, came by the Stop-and-Go store on Roberts Drive in Clayton County, Georgia, at about 5:30 p.m. on August 15, 1975, to visit with Mary, the cashier. Both friends identified Corn as the young man they saw at the store. Corn spoke with them and also asked Ms. Long if her boss was there. When the girls left about 6 p.m., Corn was still in the store.

Shortly thereafter several customers stopped by the store, and later identified Corn as the man who waited on them. They noticed that Corn had blood on his hands and arms, and had a rag wrapped around his right hand. He was wiping up blood and tinkering with the cash register. There was blood on the cash register and the counter. Corn told one of the customers, Billy Sweatman, that he had been robbed. Another customer, Rosemary Strickland, testified that Corn told her a drunk with a knife had tried to rob him and that he had been cut in the struggle. When Ms. Strickland offered to call someone, Corn said he had already called police. Ms. Strickland noticed that the cash drawer of the register was open. Mark Crabb, a frequent customer at the store, stopped there on August 15, 1975, and saw Ms. Long. Crabb also saw a man in jeans and a tee-shirt whom he later identified as Corn. Crabb left but returned later. He saw

no one; noticed blood on the counter and drops of blood leading to a back room; opened the door; and found Ms. Long on the floor. He summoned police.

An autopsy on the victim revealed multiple stab wounds, abrasions and lacerations. There were four major stab wounds, apparently made by a knife, two in front and two in back, the fatal one being through the chest.

A store supervisor ascertained that about $47 was missing from the cash register the victim had been using.

Two days later, Corn came to the Riverdale Police Station to pay a traffic ticket and officers noticed that he fit the description of the suspect in the Long murder. He was advised of his rights and questioned about an injury on his hand, which he said he had cut on a lawn mower.

Captain Quinlan of the Clayton County Police was called in and again advised Corn of his rights, after which he signed a waiver and made a statement that he spent Friday afternoon of August 15 riding around with his wife and child, going to a hamburger restaurant and returning home late that night. When police could not substantiate this alibi, Quinlan informed Corn of this and asked him to go to the Clayton County Police Department, which he willingly did.

At a Jackson-Denno hearing, (Jackson v. Denno, 378 U. S. 368 (84 SC 1774, 12 LE2d 908, 1 ALR3d 1206)), and subsequently before the jury, Captain Quinlan testified that Corn made different conflicting statements. Quinlan then ended the questioning and Corn's wife came to see Corn. Although Corn was told that anything he said to his wife could be used against him, when she asked if he had done "it," he replied, "Yes, I killed the girl, but I didn't mean to."

Corn later stated to Quinlan that he went to one store where he talked to a woman but could not bring himself to hurt her. (This woman was later identified and testified that Corn came to her store about 11 a.m. on August 15, asked her if she were afraid to be alone, paced the floor for some time, said he was waiting for his boss to pick him up, and then left in a car alone.) Corn then stated he went to a Stop-and-Go market, and that the girl there lunged at him. At this point, he became hysterical and the questioning ended.

The victim had blood type O and Corn had type A. Blood scrapings from the store, from Corn's tennis shoes, and from a steak knife furnished by Corn's wife were found to be type A or types A and O. There was testimony that prints lifted from the register and counter matched Corn's palm and fingerprints.

In the Jackson-Denno hearing, Corn testified that he had not been advised of his rights and had been threatened. He also stated that all he could remember was being in Clayton County hospital and then in Central State Hospital. The trial court ruled that his statement had been freely and voluntarily made.

The sole witness for the defense was a neuro-psychiatrist who testified that Corn had been insane and unaware of his actions on August 15.

The evidence is sufficient to support the verdict of the jury.

## II. Enumerations of Error

1. In Enumerations 1, 2, and 3, Corn alleges that a prospective juror, Vickie White, was improperly excused because of her beliefs about capital punishment, and that the questioning of jurors and exclusion of those opposed to the death penalty violated the due process clause of the Fourteenth Amendment, because death-qualified juries are more "guilt-prone" than juries which include persons opposed to capital punishment.

In response to questions about her willingness and ability to vote for a death penalty, White responded "I don't think so." This questioning followed: "Q. So what you're saying is regardless of what the evidence is and regardless of what the law is, on that point, you don't think you could impose the death penalty? A. No. Q. Under any circumstances? A. No."

Although upon further questioning she again reverted to "I don't think so," her responses clearly establish that although she "believed in" the death penalty, she could never herself vote to impose it regardless of the circumstances. Her responses fulfill the requirements set forth in Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968), and Davis v. Georgia, 429 U. S. 122 (97 SC 50 LE2d 339) (1976).

Corn offered no evidence in support of his allegation that death-qualified juries are more "guilt-prone" than those including capital punishment objectors, thus denying him a fair trial on the guilt phase. He merely restates this argument which has been already rejected by the Supreme Court in Bumper v. North Carolina, 391 U. S. 543 (88 SC 1788, 20 LE2d 797) and by this court. *Smith v. Hopper,* 240 Ga. 93 (1977); *Douthit v. State,* 239 Ga. 81 (235 SE2d 493) (1977); *Porter v. State,* 237 Ga. 580 (229 SE2d 384) (1976). Answering his further contention, *Douthit* and *Porter* also ruled that a defendant has no right to have capital punishment objectors serve on the guilt determination phase of trial as part of the "cross section of the community" to which he is entitled.

For these reasons, no point would have been served by inquiring of White whether she could have voted impartially on the guilt phase; and this "Witherspoon" questioning of the prospective jurors was not improper for any reason alleged.

2. In his fourth enumeration, Corn contends that he "was arrested without probable cause; therefore all incriminating statements and evidence obtained subsequent thereto should have been suppressed as being violative of appellant's rights granted in the Constitution of Georgia and in the Fourth Amendment to the Constitution of the United States."

Although no restraint was placed on Corn at the Riverdale Police Station when officers asked him to answer some questions, one officer testified at the trial that in his own mind he did not regard Corn as free to leave. It is on this item of testimony that Corn bottoms his illegal arrest theory.

The record shows that Corn was approached by an officer at the Riverdale Police Station where he went to pay a traffic ticket. They approached him because he fit the description witnesses had given them. He was completely agreeable to speaking with the officers. No restraint was placed on him. He was advised of his rights under the Miranda decision and made exculpatory statements. Captain Quinlan from the Clayton County Police made it clear to the other officers when he arrived

later that Corn was free to leave, thus mooting the question sought to be raised by Corn of whether the initial detaining officer had probable cause for an arrest. (The trial court found that no arrest had yet been made.) Corn was then transported to the Clayton County Police Department to take a lie detector test. He agreed to these procedures. He was not arrested until incriminating evidence had been obtained by a search of his car with his permission, search of his home with a warrant and with the cooperation of his wife, and identification by the victim of another robbery of which he was also suspected. Following his arrest and another reading of his Miranda rights and the signing of the waiver, Corn's wife arrived at the Clayton County Police Department. He asked to talk to her and a detective informed him that the detective would have to remain in the room and that anything he said could be used against him. Both the detective and Mrs. Corn testified that in response to a question by his wife Corn admitted killing Mary Long. This is the first incriminating statement Corn had made.

Considering the circumstances and the sequence of events we cannot conclude that Corn was illegally arrested at any time or that the incriminating statement he made was the product of any illegal "defacto" arrest prior to his formal arrest. His statements were properly admitted into evidence.

Although Corn seeks to challenge the admission of certain items of physical evidence found in his and his relatives' apartments, this challenge will not be heard because no objection was made at trial to the introduction of this evidence. Any objection was therefore waived. *Sheffield v. State,* 235 Ga. 507, 508 (220 SE2d 265) (1975).

Enumeration 4 is therefore without merit.

3. In Enumeration 5, Corn alleges that "The incriminating statements obtained from appellant were so obtained in violation of the Fourteenth Amendment to the Constitution of the United States as construed in Blackburn v. Alabama, 361 U. S. 199 (1960)." In Blackburn, the United States Supreme Court reversed a conviction based upon a confession where "the evidence indisputably establishes the strongest probability that Blackburn was insane and incompetent at the time he

allegedly confessed." 361 U. S. p. 207. Corn contends that his statements should not have been admitted because of his mental condition at the time he talked with the officers, and he relies on the testimony of Dr. William P. Sapp, a neuropsychiatrist who testified as a defense witness.

Dr. Sapp examined Corn some five months after the offense, and opined that on August 15, the day of the murder, Corn did not know what he was doing. He found Corn schizophrenic-affective with paranoid ideation; found some central nervous system problems; found some seizures of an epileptic or similar type; and found him psychotic.

The state, on the other hand, introduced the testimony of Dr. Miguel A. Bosch, director of forensic psychiatric services at Central State Hospital. Dr. Bosch examined Corn numerous times during the 56 days from August 21, 1975, to October 17, 1975, when Corn was a patient at Central State. Dr. Bosch found Corn to be a sane, cooperative patient who was tense and depressed and wanted reassurance. He found no evidence of epilepsy, schizophrenia or any psychosis. He testified that he had no opinion whether Corn knew right from wrong on the day of the murder because Corn had not discussed the murder, and because he did not think any psychiatrist could know what was in a patient's mind at a date prior to first encountering him.

Other than the testimony of Dr. Sapp, there is nothing in the record which indicated that Corn was mentally incompetent, though there was evidence that he had reading difficulties, a history of antisocial behavior, and a strong emotional reaction when he tried to tell a policeman that the victim lunged across the counter at him, and the officer countered by saying that the physical evidence was inconsistent with that story.

Blackburn, Fikes v. Alabama, 352 U. S. 191 (1957) and Spano v. New York, 360 U. S. 315 (1959), all cited by Corn, do not establish the proposition that one who suffers some mental or emotional impairment cannot give a valid confession. The Court in Blackburn noted that "the evidence of insanity here is compelling." 361 U. S. p. 208. The Court also reiterated that "where there is a genuine

conflict of evidence great reliance must be placed upon the finder of fact." 361 U. S. p. 208. Applying that test the Supreme Court found that there was no conflict of evidence because no credible evidence supported the findings of sanity.

In Fikes, the accused was "certainly of low mentality, if not mentally ill" 352 U. S. p. 196, and was "questioned for several hours at a time over the course of five days preceding the first confession. . ." Id. p. 197. Spano "had a history of emotional instability. . . [and] was questioned for virtually eight straight hours [through the night] before he confessed" (360 U. S. p. 322), while his numerous requests to see his retained counsel were denied.

Corn's case is unlike those just discussed. Blackburn was patently insane. The oppressive, coercive police conduct in Fikes and Spano combined with the mental defects of those men so that their will was overborne and an involuntary confession was given. Corn's case presents no such situation. He was cooperative and talkative, and quick to offer an alibi. When the alibi fell apart and he saw his wife, he confessed to her in the officers' presence.

There is ample evidence to support the trial court's conclusion that Corn's statements to the investigating officers were not rendered inadmissible by any aspect of his mental condition. A mere showing that one who confessed to a crime may have suffered from some mental disability is not a sufficient basis upon which to exclude the statement. Lego v. Twomey, 404 U. S. 477 (1972); *Goodwin v. State,* 236 Ga. 339 (223 SE2d 703) (1976); *Gibbs v. State,* 235 Ga. 480 (220 SE2d 254) (1975).

Enumeration 5 is without merit.

4. In Enumeration 6, Corn charges that the prosecutor unfairly placed his character in issue by testifying that he was apprehended in the Riverdale Police Department where he had come to pay a traffic fine. The contention is that this introduced evidence of an independent crime. No objection was made to this testimony at trial, and Corn's counsel later cross examined a witness before the jury concerning the traffic ticket in issue. By failure to object at trial, Corn has waived any objection to this evidence. *Brown v. State,* 226 Ga. 114, 116 (172 SE2d 666) (1970); Cf. *Favors v. State,* 234

Ga. 80, 88 (214 SE2d 645) (1975); *Strozier v. State,* 231 Ga. 140, 141 (200 SE2d 762) (1973); *Joyner v. State,* 208 Ga. 435 (67 SE2d 221) (1951). Moreover, this testimony was relevant to show the manner in which Corn was taken into custody. The enumeration of error on this ground is frivolous, even were we to consider it on the merits. See, e.g., *Gravitt v. State,* 239 Ga. 709 (1977); *Fleming v. State,* 236 Ga. 434, 439 (224 SE2d 15) (1976).

5. In Enumeration 7, Corn alleges "The court erred by failing to grant appellant's motion for a directed verdict as to the armed robbery count as the prosecution failed to meet its burden of proof." The contention is that the state failed to prove that Corn actually took money from the register, and that if he did the state failed to exclude a reasonable possibility that it was an afterthought and not the motive with which he killed the victim.

The direct and circumstantial evidence that the cashier Mary Long was killed with a sharp instrument, and that Corn was seen working the cash register with blood on him and exercising dominion over the cash register, coupled with the losses calculated by the manager is sufficient to support the ruling of the trial court as to the armed robbery count. *Cunningham v. State,* 235 Ga. 126, 127 (218 SE2d 854) (1975).

The state's case with respect to Corn's actual motive for the murder was necessarily circumstantial. Review of the record shows that the state met its burden of proof under Code § 38-109 to exclude all reasonable hypotheses other than commission of murder for the purpose of armed robbery. Not even in his brief on appeal (wherein he raises this second issue for the first time) does Corn suggest any other possible motive for the murder.

The trial court did not err in overruling the motion for directed verdict on the armed robbery count.

6. Corn's eighth enumeration raises two issues. First he asserts that the court erred in failing to grant a continuance in order that he might have more time to prepare his insanity defense; and then he urges that he was denied due process and equal protection of the laws because the state did not furnish him with additional psychiatric evaluation to aid in the preparation of his

insanity defense.

All applications for continuances are addressed to the sound legal discretion of the court, and, if not expressly provided for, shall be granted or refused as the ends of justice may require. Code Ann. § 81-1419. The trial court was under no statutory nor constitutional duty to appoint a state-paid psychiatrist to evaluate Corn, even though he had filed a special plea of insanity. *Taylor v. State,* 229 Ga. 536 (192 SE2d 249) (1972). Nonetheless, he received repeated psychiatric evaluation at state expense. He was arrested on August 17, 1975, and on August 21, 1975, a court order was entered transferring him to Central State Hospital for purposes of evaluation and treatment at defense counsel's request. He remained at Central State for 56 days until October 17, 1975. During this period he was evaluated and treated by Dr. Miguel A. Bosch, a psychiatrist. Corn was not satisfied with Dr. Bosch's evaluation, and at his request one continuance in his trial was granted so that he might obtain additional independent psychiatric evaluation. Clayton County apparently paid for these services after Corn's mother promised reimbursement. Both Dr. Sapp, Corn's independent psychiatrist, and Dr. Butcher, his independent licensed psychologist, were prepared to testify in his behalf at his trial (and Dr. Sapp did testify). Following these independent evaluations, Corn filed his special plea of insanity. A week later the trial court entered an order requiring a fourth psychological evaluation at state expense with approval of Corn's counsel. Corn was evaluated by Kirk M. Lalor, M. A., of the Mentally Disabled Offenders Service, Clayton County Mental Health Service.

On February 24, 1976, a jury heard Corn's special insanity plea and found him sane. He then entered a plea of guilty but withdrew his plea on April 7, 1976.

Thus, prior to his motion for continuance which was filed the morning of trial, May 24, 1976, Corn was evaluated four different times at state expense over a nine-month period.

We find no abuse of discretion by the trial court in denying Corn's motion for continuance. *Morgan v. State,* 135 Ga. App. 139, 140 (217 SE2d 175) (1975). The facts

illustrate that he had ample access to expert psychiatric evaluation to aid in the preparation of his defense.

Enumeration 8 is without merit.

7. In Enumeration 9 Corn alleges that the court erred in failing to grant his pre-trial motion for continuance made on the ground that the transcript of his trial on the special plea of insanity and his sentencing hearing were not yet available, and were critical to the preparation of his defense.

At the outset we note that a hearing upon a special plea of insanity is a proceeding of a civil nature, in which the burden rests on defendant to produce evidence of his insanity. *Williams v. State,* 238 Ga. 298, 304 (232 SE2d 535) (1977).

The record reflects that Corn filed his motion for continuance on May 24, 1976, the day of trial. There is some indication that he had been represented by the same two attorneys since August 21, 1975, and the record is clear that they had represented him since arraignment on October 28, 1975. His attorneys had been furnished with copies of psychiatric evaluations conducted by the state and had two state-paid private psychiatric evaluations. His counsel were informed of the list of state's witnesses on October 29, 1975. On November 13, 1975, the state served defense counsel with a complete list of names and addresses of witnesses to be used in the sentencing phase of Corn's trial. One continuance in the trial date was granted on Corn's motion for further psychiatric evaluation. A hearing on his special plea of insanity was held and evidence produced by each party. Both attorneys for Corn were present at the sentencing trial following an earlier plea to the charges in this case. The state alleges, and it is unrefuted, that thirteen state's witnesses appeared and defense counsel had opportunity to make a thorough and sifting examination of each. At the hearing on the countinuance motion, defense counsel stated that the transcript was desired for preparation, and not for impeachment of the state's witnesses. We cannot conclude that the trial court on these facts abused its discretion in denying the continuance.

Corn concedes that the matter lay within the discretion of the trial judge, but he asserts harm from the

ruling. He relies on *Terrell v. State,* 136 Ga. App. 848 (222 SE2d 642) (1975) in which the Court of Appeals reversed a conviction for the trial court's failure to grant defense counsel a requested continuance to review a commitment hearing transcript which he received only one and one-half hours prior to trial. That case is inapposite: at a commitment hearing the state carries the burden of showing cause to detain the defendant for the grand jury (*State v. Houston,* 234 Ga. 721, 722 (218 SE2d 13) (1975)), making a record of its case which the defense might profitably review in detail. A hearing on a special plea of insanity finds the parties in a different stance: since it is the defendant who must present the evidence, it is much less obvious why he would later need a transcript of his own presentation.

From the foregoing we conclude that Corn's counsel had ample time to prepare for trial and he was not deprived of the effective assistance of counsel by the denial of another continuance to obtain this transcript.

Enumeration 9 is without merit.

### III. Sentence Review

The death penalties imposed in this case must conform to the standards set forth in Code Ann. § 27-2534.1 to authorize affirmance. This court must determine whether the sentences of death were imposed under the influence of passion, prejudice, or any other arbitrary factor; whether the evidence supports the jury's findings of statutory aggravating circumstances; and whether the sentences of death are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, as required by Code Ann. § 27-2537 (c) (1-3). We conclude that the sentences of death imposed on Charles Corn were not imposed under the influence of passion, prejudice or any other arbitrary factor.

The jury found as statutory aggravating circumstances —

1. As to the armed robbery, "The offense of . . . armed robbery was outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind." Code Ann. § 27-2534.1 (b) (7).

2. As to the murder—

a. The offense of murder was committed while the offender was engaged in the commission of another capital felony. Code Ann. § 27-2534.1 (b) (2).

b. The offender committed the offense of murder for himself for the purpose of receiving money or any other thing of monetary value. Code Ann. § 27-2534.1 (b) (4).

c. The offense of murder and armed robbery was outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind. Code Ann. § 27-2534.1 (b) (7).

The evidence supports the statutory aggravating circumstances found.

Pursuant to the rationale of our decision in *Gregg v. State,* 233 Ga. 117 (210 SE2d 659) (1974), the death sentence for armed robbery is reversed and remanded for sentencing to the trial court.

Additional aggravating matter concerning Corn was offered and admitted during the sentencing phase of the trial. Corn's low mental level and social maladjustment were presented to the jury and have been considered in this review but are not found to be of such magnitude as to constitute mitigation or extenuation to justify a reduction in the sentence when considering both the crime and the defendant.

In reviewing the death penalty in this case, we have considered the cases appealed to this court since January 1, 1970, in which a death or life sentence was imposed for murder, and we find the similar cases listed in the Appendix support affirmance of the death penalty for murder.

Thomas Corn's sentence to death for murder is not excessive or disproportionate considering the crime and the defendant.

*Judgment affirmed in part, reversed and remanded in part. All the Justices concur.*

ARGUED MAY 9, 1977 — DECIDED NOVEMBER 8, 1977.

*Thomas K. McWhorter,* for appellant.

*William H. Ison, District Attorney, Clifford A. Sticher, Assistant District Attorney, Arthur K. Bolton, Attorney General, G. Stephen Parker, Assistant Attorney General,* for appellee.

APPENDIX.

*Gregg v. State,* 233 Ga. 117 (210 SE2d 659) (1974); *Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1975); *Floyd v. State,* 233 Ga. 280 (210 SE2d 810) (1974); *Jarrell v. State,* 234 Ga. 410 (216 SE2d 258) (1975); *Mitchell v. State,* 234 Ga. 160 (214 SE2d 900) (1975); *Berryhill v. State,* 235 Ga. 549 (221 SE2d 185) (1975); *Dobbs v. State,* 236 Ga. 427 (224 SE2d 3) (1976); *Goodwin v. State,* 236 Ga. 339 (223 SE2d 703) (1976); *Pulliam v. State,* 236 Ga. 460 (224 SE2d 8) (1976); *Birt v. State,* 236 Ga. 815 (225 SE2d 248) (1976); *Pryor v. State,* 238 Ga. 698 (234 SE2d 918) (1977); *Young v. State,* 239 Ga. 53 (236 SE2d 1) (1977).