## 44619. FRAZIER v. THE STATE.
(362 SE2d 351)

SMITH, Justice.

The appellant, Leonard Junior Frazier, was convicted by a jury in Walker County on two counts of murder and one count of armed robbery and sentenced to death. He appeals. We affirm.[1]

1. Frazier met with his nephew Jimmy Asher on the evening of January 8, 1986. They drank several beers together, and Frazier stated that he knew where they could get a lot of money.

The two of them drove to the home of Warren and Eva Peppers, an elderly couple for whom Frazier had previously worked. Asher hid a baseball bat in his trousers, and they were invited into the Peppers' home.

After discussing possible work for a few minutes, Frazier (according to Asher) signalled to Asher that he wanted the baseball bat, and then proceeded to beat the Peppers to death. (According to Frazier, it was Asher who beat the couple to death.) The two defendants took from the residence two guns and a wallet containing two hundred dollars.

The Peppers' neighbors saw Frazier's automobile parked at the Peppers' residence at approximately 7:00 p.m. When the neighbors returned from Wednesday evening church service at 8:30, they visited

---

[1] The crime was committed January 8, 1986. Appellant was arrested the next day. He was tried January 12 through 22, 1987. A motion for new trial was filed on February 20, 1987. This motion was heard on March 17, 1987 and denied on March 18, 1987. The case was docketed in this court on April 29, 1987 and after the parties were granted extensions of time to file their briefs and to prepare for oral arguments, the case was orally argued on September 8, 1987.

the Peppers and discovered them lying on the floor, covered with blood.

Frazier sold one of the guns that evening. Law enforcement officers recovered it the next day.

Frazier and Asher were arrested. Frazier's room was searched and officers seized blood-stained clothing, which Frazier later admitted he had worn on the evening of the murders.

The conviction is supported by the evidence. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Appellant contends that his challenges to the arrays of the grand and traverse juries should have been granted. As he points out, OCGA § 15-12-40 (a) (1) directs the board of jury commissioners in each county to compile a jury list "of intelligent and upright citizens of the county to serve as trial jurors." In addition, OCGA § 15-12-40 (a) (2) directs the board of jury commissioners to compile a grand jury list "of the most experienced, intelligent, and upright citizens of the county to serve as grand jurors."

Appellant contends that, inasmuch as the commissioners in Walker County used only the criteria of age, race and sex in selecting potential jurors for inclusion on the lists, the commissioners failed to ensure that persons on the traverse jury list were "intelligent and upright" and that persons on the grand jury list were the "most experienced, intelligent and upright citizens of the community."

As the Code requires, the potential jurors were selected primarily from the voter registration list. Id. Appellant has not shown that the persons so selected were lacking in intelligence, experience, or uprightness. In any event, it has been held that so long as a jury list meets equal-protection and fair-cross-section standards respecting the inclusion of cognizable groups, "the statutory procedures for creating the list are merely directory," and do not create a basis for sustaining challenges to the array. *Dillard v. State*, 177 Ga. App. 805, 807 (341 SE2d 310) (1986).

Appellant further contends that blacks and other minorities have been discriminated against in the selection of grand jury foremen in Walker County. Inasmuch as appellant is a white male, he lacks standing to assert such a claim. *Castaneda v. Partida*, 430 U. S. 482, 494-95 (97 SC 1272, 51 LE2d 498) (1977). See also *Ingram v. State*, 253 Ga. 622 (1 c) (323 SE2d 801) (1984).

Regarding appellant's next claim, we do not find that the manner in which excusals and deferrals were granted in this case has resulted in the substantial underrepresentation of cognizable groups on the jury venires actually present for trial. Minor deviations from the statutory requirements respecting juror excusals do not invalidate the traverse jury array. *Ingram v. State*, supra, 629-30 (1 e).

Finally, that one of the six jury commissioners failed to partici-

pate in the compilation of the grand jury list because she underwent surgery is not a circumstance that would "vitiate" the grand jury array. *Pope v. State*, 256 Ga. 195, 197 (1 c) (345 SE2d 831) (1986).

3. The trial court did not err by denying appellant's motion to declare unconstitutional the Georgia Unified Appeal Procedure and various Georgia statutes relating to the imposition of the death penalty, or by denying appellant's motion to bar the imposition of the death penalty in this case.

4. It was not error to try the issues of guilt and sentence before the same jury (in bifurcated proceedings), or to death-qualify prospective jurors during voir dire. *Lockhart v. McCree*, ___ U. S. ___ (106 SC 1758, 90 LE2d 137) (1986).

5. Appellant demurred to the indictment on the ground that it did not specify whether the element of malice was expressed or implied. The trial court properly overruled the demurrer. On an indictment for malice murder, "the State may introduce any evidence which is relevant and material upon the issue of malice, either express . . . or implied . . . ; and it is unnecessary for the indictment to allege more specifically the facts which will be relied upon to establish malice." *Perry v. State*, 78 Ga. App. 273, 277 (50 SE2d 709) (1948).

6. The trial court did not err by denying appellant's motion for recordation of the entire grand jury proceedings, plea in abatement, motion to sever (that is, to present separate indictments charging this defendant with murder to separate grand juries), request for an order instructing the state not to present to the grand jury evidence of similar offenses, and motion to have the trial court question each grand juror about his or her exposure to pre-trial publicity. See, e.g., *Felker v. State*, 252 Ga. 351 (2 a) (314 SE2d 621) (1984); OCGA §§ 15-12-82; 15-12-83.

7. Prior to trial, appellant filed a plea of misnomer, alleging that he had never been known as Leonard Frazier, that such was not his true name nor the name by which he was generally called, and that his true name was Leonard Frashier (rhyming with Thrasher). See OCGA § 17-7-112.

At the hearing on this motion the state offered in evidence 18 documents signed by appellant over a six-year period as "Frazier." (In addition, five documents admitted at trial and three in the record, including his financial affidavit, were signed by appellant as "Frazier.") A police officer testified that he had known appellant for 14 years as Frazier, not Frashier.

The trial court considered this evidence, and, noting that appellant's name had been mentioned numerous times in previous hearings in the case and that his name had never been pronounced "Frashier to rhyme with Thrasher," denied the plea of misnomer.

A defendant may be indicted properly "under a name by which

he is generally known and called, whether this be his true name or not." *Roland v. State,* 127 Ga. 401, 402 (56 SE 412) (1906). If Frazier is not appellant's true name, it clearly is one by which he is "generally known and called." Ibid. We find no error in the denial of the plea.

8. Appellant's co-defendant, Jimmy Asher, pled guilty prior to appellant's trial. In return for the state's promise not to seek a death sentence against him, Asher agreed to testify at appellant's trial, and to provide the state with the investigative file compiled by Asher's court-funded private investigator.

Appellant contends that providing the state with this investigative file violated his attorney-client privilege. See OCGA § 24-9-21 (2). However, Asher's investigative file contained no confidential communications between appellant and appellant's attorney, nor any of the latter's work product. See *Atlantic C.L.R. Co. v. Daugherty,* 11 Ga. App. 144 (141 SE2d 112) (1965). Hence, none of the material disclosed to the state is encompassed by appellant's attorney-client privilege, and appellant may not invoke another's privilege, even if the other is his co-defendant.

9. Attorney Ronald Silvey originally was one of two attorneys appointed to represent co-defendant Asher, while attorney Ken Poston was one of two attorneys appointed to represent appellant. Silvey represented Asher for two weeks in January 1986 and then was relieved of the appointment when Silvey's law firm hired David Dunn who, until then, had been employed as an assistant district attorney. Poston represented appellant for almost a month, and was removed from the case in February 1986.

The case was tried in January 1987. Subsequently, prior to the court's disposition of the motion for new trial, Poston was hired, and Dunn was rehired, by the district attorney's office.

Appellant filed pre- and post-trial motions to disqualify the district attorney and his staff from prosecuting this case, on conflict of interest grounds. He contends the trial court erred by overruling these motions.

There is no issue here about the propriety of any involvement by Poston or Dunn at the trial or in the post-conviction proceedings in this case. It would clearly be improper for an attorney to change roles from the prosecution to the defense (and vice versa) in the same case. *Lane v. State,* 238 Ga. 407 (4) (233 SE2d 375) (1977). Quite properly, neither Dunn nor his firm participated in the defense of this case after Dunn left the district attorney's office in January 1986. Nor has Dunn or Poston participated, directly or indirectly, in the prosecution of this case since joining the office of the district attorney after the case was tried.

Appellant argues, however, that because Dunn and the district attorney reached an agreement prior to trial that Dunn would rejoin

the office at some future date (the target being early 1987) and because Dunn and Poston did join the district attorney's office after the trial, but while post-trial proceedings were pending, the *entire* district attorney's office should have been disqualified from prosecuting the case, including the post-conviction proceedings, on a theory that a district attorney's office is like a law firm and that where one member of a firm is disqualified, all members should be.

It is true that Directory Rule 5-105 (D) of the Georgia Code of Professional Responsibility states: "If a lawyer is required to decline employment or to withdraw from employment under [D.R. 5-105], no partner or associate of his or his firm may accept or continue such employment." See also Disciplinary Standard 38, 252 Ga. at 649. However, a majority of jurisdictions addressing the issue have concluded that "the Code of Professional Responsibility was intended to recognize a distinction between private law firms and government prosecutorial offices." *State v. Fitzpatrick*, 464 S2d 1185, 1187 (Fla. Sup. Ct. 1985) and cites. "[T]he imputed disqualification rule [was not meant] to encompass governmental law offices . . ." Ibid.

As the ABA explained in formal opinion 342: "The salaried government employee does not have the financial interest in the success of departmental representation that is inherent in private practice. This important difference in the adversary posture of the government lawyer is recognized by Canon 7: the duty of the public prosecutor to seek justice, not merely to convict, and the duty of all government lawyers to seek just results rather than the result desired by a client. The channeling of advocacy toward a just result as opposed to vindication of a particular claim lessens the temptation to circumvent the disciplinary rules through the action of associates. Accordingly, we construe D.R. 5-105 (D) to be inapplicable to other government lawyers associated with a particular government lawyer who is himself disqualified by reason of D.R. 4-101, D.R. 5-105, D.R. 9-101 (B), or similar disciplinary rules. Although vicarious disqualification of a government department is not necessary or wise, the individual lawyer should be screened from any direct or indirect participation in the matter, and discussion with his colleagues concerning the relevant transaction or set of transactions is prohibited by those rules." 62 ABAJ 517, 522 (1976).

*Davenport v. State*, 157 Ga. App. 704 (1) (278 SE2d 440) (1981), does not hold to the contrary. There, the district attorney was disqualified from prosecuting the case. Although he did not try the case himself, he was present at the state's table throughout the trial. This active participation was improper. *Davenport* does not hold that the entire office was disqualified.

We find no misconduct in this case, and no error in the trial court's denial of appellant's motions to disqualify the district attor-

ney and all of his staff from the prosecution of this case.

10. A defendant in a death penalty case is entitled by law to exercise 20 peremptory challenges in the selection of the jury. The state may exercise 10. OCGA § 15-12-165. The trial court did not err by denying appellant's request for additional peremptory challenges. *Ford v. State*, 255 Ga. 81 (4) (335 SE2d 567) (1985).

Nor did the court err by refusing to give appellant's requested pre-voir-dire charge explaining some of the procedural aspects of the trial and the potential subject matter of voir dire. Such instructions may be given, in the discretion of the court, but are not required. Cf. *Oliver v. State*, 168 Ga. App. 477 (4) (309 SE2d 627) (1983).

11. Although the voir dire examination lasted four days and fills some 1400 pages of the trial transcript, appellant contends that it was "severely limited." We do not agree. The trial court did not abuse its discretion in the conduct of the voir dire. *Spivey v. State*, 253 Ga. 187, 193 (6 a) (319 SE2d 420) (1984); *Roberts v. State*, 252 Ga. 227 (10 f) (314 SE2d 83) (1984).

Nor did the trial court err by denying appellant's motion for change of venue.

Over a year elapsed between the commission of the crime and the trial of the case. The case was given some attention by the news media around the time of the crime. The record does not show that the case was extensively publicized thereafter, nor does it show such extensive publicity as would give rise to a presumption of prejudice. Compare *Coleman v. Kemp*, 778 F2d 1487 (11th Cir. 1986). The actual selection process — the voir dire examination and the qualification of the venire — shows that, although most of the prospective jurors had heard something about the case, the great majority of them had not formed fixed opinions about guilt, innocence, or possible sentence. Compare *Chancey v. State*, 256 Ga. 415, 430 (349 SE2d 717) (1986). Appellant has not shown that he could not get a fair trial in Walker County.

12. During the voir dire examination of the first panel of jurors, appellant stood up, took a few steps, and fell to the floor. He was escorted out of the courtroom and examined by Dr. George Shaw, a medical doctor retained by the county to provide medical care to the inmates of the county jail. Dr. Shaw reported to the trial court that appellant apparently had hyperventilated and had a "very mild" epileptic seizure. Dr. Shaw stated his intention to administer a dosage of Dilantin, which appellant had "previously refused to take . . . while in the jail . . ."

As a precaution, appellant was taken to the hospital for further testing and examination. Upon appellant's return to the courtroom that afternoon, the trial court stated for the record that blood tests showed that appellant already had taken a large quantity of Dilantin

prior to trial, and that appellant's stomach had been "pumped." Other tests indicated that appellant had not, in fact, had a seizure, but Dr. Shaw reported that perhaps appellant "did hyperventilate and pass out." Then the court ruled: "Dr. Shaw said he could go to trial, no problem with him understanding what is going on, conferring with you, and going to trial, and that is what we are going to do."

The next morning, appellant's attorney requested a continuance on the ground that appellant was too intoxicated to assist his attorneys. Appellant was called to the stand to testify in support of the motion. He admitted stockpiling Dilantin in his cell and taking a large amount the day before the trial started. He testified that even though he had been kept in isolation the previous night and had therefore taken no additional Dilantin, he still felt the effects of the original dose, feeling "right now" like "I drunk about a half gallon of whiskey." On cross-examination, he testified that he could see the assistant district attorney only as a "blur." However, when the assistant asked appellant about a certain deputy, appellant looked in the deputy's direction even though he was "thirty to forty feet" away. When this was noted by the assistant D.A., the appellant stated, "I see a badge over there."

A deputy testified that appellant seemed to be coherent that morning.

Appellant was offered an opportunity to get a blood test, to determine the level of Dilantin in his system, "during the break or lunch recess." No results from such a test appear in the record.

"A motion for continuance is addressed to the sound discretion of the trial court, OCGA § 17-8-22 . . ." *O'Neal v. State*, 254 Ga. 1, 2 (325 SE2d 759) (1985). We find no abuse of discretion here. The length of time that had elapsed since appellant's intentional overdose, the doctor's evaluation and report, appellant's own coherent testimony, and the trial court's observations of the appellant that day and the day before, all support the trial court's conclusion that appellant was capable of proceeding.

13. Appellant contends the trial court erred by overruling his hearsay objection to testimony by GBI agent Bonnell about co-defendant Asher's statements. The state responds that appellant "opened the door" to this testimony when it cross-examined another state witness about Asher's inconsistent statements. We note that Asher himself testified. Hence, either party would have been entitled to prove Asher's prior consistent and inconsistent statements. See *Cuzzort v. State*, 254 Ga. 745 (334 SE2d 661) (1985); *Gibbons v. State*, 248 Ga. 858 (286 SE2d 717) (1982). Any possible error in allowing Bonnell's testimony was rendered harmless when Asher testified as a state's witness.

14. Appellant testified at the hearing on the admissibility of his

confession that, when he was arrested, he asserted his right to counsel. His mother also testified that he asserted his right to an attorney. However, an FBI agent who participated in the arrest and an officer who transported appellant to jail testified that appellant did not assert a right to counsel.

The transcript of the tape-recorded confession shows that appellant was advised of his rights under *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966), and that, at least at that time, appellant waived his right to remain silent and his right to an attorney and stated that he was willing to talk to the officers.

Appellant contends that the trial court erred by finding the confession to be voluntary and admissible and argues that his rights under *Edwards v. Arizona*, 451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981), were violated. *Edwards* holds that once an accused in police custody asserts his right to counsel, he may not be further interrogated by the authorities until counsel has been furnished to him, "unless the accused himself initiates further communications, exchanges, or conversations with the police." Id at 485.

However, "[u]nless clearly erroneous, a trial court's findings as to factual determinations and credibility relating to the admissibility of a confession will be upheld on appeal. [Cits.]" *Berry v. State*, 254 Ga. 101, 104 (326 SE2d 748) (1985). The trial court in this case found as a fact that appellant "did not request an attorney at any time prior to any of the statements tendered by the state." This finding is not clearly erroneous. We find no error under *Edwards v. Arizona*, supra, or under *Miranda v. Arizona*, supra.

Appellant also complains of the admission of his complete statement on the ground that it contained a reference to his "bad record." We note that appellant was attempting to explain why he did not "call the law" when Asher committed the crime while appellant waited in the car. In these circumstances, " ' "[i]t is no valid ground of objection to the admission in evidence of an incriminatory statement or confession made by the accused in a criminal case that the language indicated that the accused had committed also another and separate offense. [Cits.]" ' " *Ingram v. State*, 253 Ga. 622, 638 (323 SE2d 801) (1984).

15. The state tendered in evidence a number of photographs of the victims to show the nature and extent of the wounds that were inflicted. Some were subsequently withdrawn after the trial court suggested that they were repetitious, and questioned their necessity. The ones that were admitted do not violate the rule set forth in *Brown v. State*, 250 Ga. 862 (5) (302 SE2d 347) (1983), and were not irrelevant. We find no abuse of discretion in the court's handling of their admission. *Hicks v. State*, 256 Ga. 715 (13) (352 SE2d 762) (1987).

16. As stated previously, appellant and Asher took two guns (a

pistol and a rifle) from the Peppers. After leaving the Peppers residence, they went to see appellant's brother Vernon. Appellant tried unsuccessfully to sell the pistol. They went next to appellant's brother Edward. Telling Edward's wife that he had taken the pistol in a burglary in Tennessee, appellant traded it for a sawed-off shotgun.

They returned to Vernon's home. Appellant walked into the room where Brenda Hicks slept, pointed the shotgun at her face, and demanded that she "give her body up." He bragged about having hurt some people.

The next day, appellant and Asher were arrested. The stolen pistol was recovered from Edward's home, and the stolen rifle and the sawed-off shotgun were recovered from Vernon's home, where appellant had left them before he was arrested.

Appellant contends that the foregoing circumstances were irrelevant to the crime on trial and improperly injected his character in evidence. We do not agree.

Evidence is not inadmissible "simply because it might incidentally reflect on the defendant's character." *Felker v. State*, supra, 252 Ga. at 365. *Any* evidence establishing that a defendant has committed the crimes for which he is being tried (here, two murders and an armed robbery) will inevitably say something about his character. What is forbidden is the introduction by the state in the first instance of evidence whose *sole* relevance to the crime charged is that it tends to show that the defendant has bad character. See OCGA §§ 24-2-2 and 24-9-20. That is, unless and until the defendant elects to make it so, character *per se*, good or bad, is not an issue in the case. However, " '[t]here are numerous . . . purposes [other than character] for which evidence of other criminal acts may be offered, and when so offered, the rule of exclusion is simply inapplicable.' McCormick on Evidence (2nd ed. 1972), § 190, pp. 447-448 [footnote omitted]." *Fugitt v. State*, 256 Ga. 292, 294 (348 SE2d 451) (1986).

In this case, appellant admitted being at the scene of the crimes, but denied killing the victims himself, and tried to minimize the extent of his participation in the crimes. Evidence that later in the same evening that the Peppers were murdered, appellant, and not Asher, tried to sell the Peppers' gun to appellant's brothers, and that appellant, and not Asher, pointed a shotgun at Brenda Hicks and bragged about hurting some people, was properly admitted as part of the "res gestae" of the crimes on trial, and to show appellant's state of mind at a relevant time, and, by inference, the true extent of his participation in the Peppers crimes. See *Satterfield v. State*, 256 Ga. 593 (6) (351 SE2d 625) (1987); *Walraven v. State*, 250 Ga. 401, 408 (297 SE2d 278) (1982); McCormick on Evidence (3rd ed. 1984), § 190, pp. 558-59 and 561.

The state also proved that two months prior to the crime on trial,

appellant and two co-defendants, including Asher, broke into the home of an elderly woman intending to rob her, and appellant beat her over the head with a shotgun until she passed out.

Appellant argues that this evidence should have been excluded because it was not established that appellant participated in the crime. The victim could not positively identify appellant as her attacker, and the only other witnesses were the two accomplices.

As appellant contends, a defendant may not be convicted on the uncorroborated testimony of an accomplice. OCGA § 24-4-8. However, the issue here is not the *sufficiency* of evidence, but the *admissibility* of evidence. *Felker v. State*, supra at 362. But in any event, it is well established that the testimony of a second accomplice is sufficient to corroborate that of the first. *Pope v. State*, 171 Ga. 655 (156 SE 599) (1930). We cannot agree with appellant's contention that the testimony of the two accomplices was insufficient to establish that appellant perpetrated the extrinsic crime. *French v. State*, 237 Ga. 620, 621 (229 SE2d 410) (1976).

Nor can we agree that it was irrelevant that, two months prior to the crime on trial, appellant committed a similar crime with one of the same accomplices and was identified by both of his accomplices as being the person who severely beat an elderly victim for whom (like the Peppers) appellant had previously worked.

Appellant contended in his pre-trial statements and in his testimony that he had just stopped by to see the Peppers to talk about cutting some wood when Asher pulled out a baseball bat and attacked Mr. Peppers. He testified at trial that Asher took the victim's pistol, pointed at appellant and said, "If you tell on me what I done, I'll blow your brains out with this pistol." Appellant claimed that he went to his car and waited while Asher killed Mrs. Peppers and stole the two guns.

In view of these contentions, the crime committed two months earlier was relevant to "show, by similar acts or incidents, that the act in question was not performed inadvertently, accidentally, involuntarily, or without guilty knowledge." McCormick on Evidence (3rd ed.), supra at 561.

The "other-crime" evidence presented in this case was properly admitted.

17. The trial court did not err by refusing to give appellant's request to charge theft by receiving, OCGA § 16-8-7, as a lesser included offense of armed robbery inasmuch as theft by receiving is not a lesser included offense of armed robbery. Cf. *Sosbee v. State*, 155 Ga. App. 196, 197 (270 SE2d 367) (1980).

Nor did the trial court err by refusing to give appellant's request to charge on theft by taking. OCGA § 16-8-2. The evidence in this case shows the commission of an armed robbery by use of an offensive

weapon. OCGA § 16-8-41. Appellant contended that Asher took the guns after appellant left the house. He denied taking anything from the Peppers himself. Hence, appellant was not entitled to a charge on theft by taking as a lesser offense of the armed robbery, notwithstanding his admission that he later took the pistol from Asher, as this latter act clearly was not an offense included as a matter of fact in the charge of armed robbery of the Peppers. *Shepherd v. State,* 234 Ga. 75 (3) (214 SE2d 535) (1975).

18. On May 16, 1986, the trial court granted appellant's motion for funds to retain the services of an independent psychiatrist (and, as well, for an investigator and a "criminology expert"). At a hearing on May 27, 1986, appellant's attorney stated that Dr. James Cheatham, a Harvard-trained, board-certified psychiatrist practicing in Smyrna, had been retained to evaluate the appellant.

Dr. Cheatham was called as a defense witness at the sentencing phase of the trial. He testified that appellant had a history of epilepsy and that a CAT (computerized axial tomography) scan indicated a brain abnormality — a rather large brain cyst — that in the doctor's opinion, "is the cause of his epilepsy," and would likely cause "some changes in his behavior, such as rage states, poor impulse control."

Appellant argues that this testimony was newly discovered evidence of such materiality as to require the grant of a new trial. See OCGA § 5-5-23. We do not agree. Pretermitting whether this evidence can be considered "newly discovered" in view of the length of time (some eight months) that Dr. Cheatham was available to appellant prior to trial, it is not "so material that it would probably [have] produce[d] a different verdict . . ." if it had been introduced at the guilt-innocence phase of the trial. *Timberlake v. State,* 246 Ga. 488, 491 (271 SE2d 792) (1980). Dr. Cheatham did not testify that appellant was insane at the time of the crime. See OCGA §§ 16-3-2 and 16-3-3. His testimony established only that appellant's brain abnormality would, to an uncertain extent, diminish his impulse control and increase his tendency to rage states. Such evidence establishes no defense to the crime. *Hicks v. State,* supra, 256 Ga. at 726-27. The trial court therefore did not err by denying appellant's motion for a new trial based on newly discovered evidence.

19. The trial court did not err by refusing to give appellant's requested charge on voluntary intoxication as a defense. While it is true that one who did not intend to do the act charged, for whatever reason, cannot be found guilty of any crime in which intent is an essential element of the crime, see *Sandstrom v. Montana,* 442 U. S. 510 (99 SC 2450, 61 LE2d 39) (1979), voluntary intoxication is not itself a "defense," and the requested charge was not an accurate statement of law. *Gilreath v. State,* 247 Ga. 814, 831 (279 SE2d 650) (1981). We note that the trial court instructed the jury that intent was an essen-

tial element of the crimes charged, and that the burden was on the state to prove intent beyond a reasonable doubt. See *Pope v. State,* supra, 256 Ga. at 208-209.

20. Contrary to appellant's contention, we do not find that the prosecutor improperly expressed a personal opinion in his opening statement at the sentencing phase of the trial. Compare *Ford v. State,* supra, 255 Ga. at 91-92.

21. The evidence introduced by the state at the penalty phase included testimony from several witnesses establishing that appellant had previously threatened and beaten several people, including his son, his ex-girl friend and his sister-in-law, and had bragged about killing some people, including a newsboy in Walker County, a man in South Pittsburg, Tennessee, and a prostitute in Catoosa County.

Appellant argues, first, that it is improper to prove in aggravation specific bad acts for which there has been no conviction. This contention is incorrect. *Devier v. State,* 253 Ga. 604 (9) (323 SE2d 150) (1984). See also, e.g., *Jefferson v. State,* 256 Ga. 821, 827 (353 SE2d 468) (1987).

Second, he contends that it was improper to allow the state to prove that appellant had bragged about committing murders which appellant had not actually committed.

This evidence was not offered, however, to prove that appellant had actually committed these murders. In fact, the three witnesses who testified about appellant's boasts testified that they did not know if any of it was true. One of them, co-defendant Asher, testified that he did not believe appellant's boasts. Another, his purported wife, testified that, insofar as the newsboy was concerned, "I didn't believe it then and I don't believe it now because I don't even think he was here at the time . . . [H]e always does like that, anything that goes on like that, he says he did it."

The state offered this evidence to show that appellant had bragged about killing people, insofar as that was relevant to his character. As the assistant D.A. explained, "What kind of person brags about killing other people. That's why they were offered. Not to prove at any point that he actually did it."

In these circumstances, the admission of this testimony was not error. *Fair v. State,* 245 Ga. 868, 873-74 (268 SE2d 316) (1980).

Third, appellant argues that he was not properly notified about this evidence. See OCGA § 17-10-2. However, appellant was given a list of all witnesses, and was served with a copy of a notice styled, "Non-Statutory Evidence To Be Used in Aggravation," which summarized this evidence. Moreover, appellant's attorneys were given free access to the state's file and were given copies of statements by these witnesses. We find no lack of notice.

Next, appellant argues that the trial court erred by refusing to

require the prosecutor to state in his place that he intended to prosecute appellant for the murder of the newsboy. We find no error here.

Finally, he argues that a letter written by appellant to his purported wife from a New York prison, in which he referred to the South Pittsburgh killing, should have been excluded pursuant to OCGA § 24-9-21 (1), as a privileged communication between husband and wife. At the hearing on this issue, the state offered documentary evidence, and the testimony of the purported wife, which proved that she married appellant while she was still married to another. Her marriage to appellant therefore was invalid. See OCGA § 19-3-2 (3); *Gearllach v. Odom*, 200 Ga. 350 (37 SE2d 184) (1946). Hence, no marital privilege applied.

22. The state also introduced in aggravation a four-count indictment from New York, charging appellant with burglary, grand larceny, criminal possession of stolen property and criminal possession of a weapon. All four counts related to the theft of four shotguns from the residence of one Dale Bush.

Appellant pled guilty to counts I and III, the counts charging burglary and criminal possession of stolen property. He objected at trial to the admission of the entire indictment, and now contends that it was error to admit in evidence the two counts for which appellant has never been tried or convicted. See *Jefferson v. State*, supra, 256 Ga. at 827-28. However, the trial court agreed that it would be appropriate to "white . . . out" those two counts. Appellant did not raise the issue again until the trial was over, notwithstanding that his counsel was given an opportunity to review the exhibits before they went to the jury. We find no reversible error.

23. The trial court did not err by telling the jury at the sentencing phase that it need not elect a foreman, since it had already done so at the previous phase of the trial.

24. Contrary to appellant's contentions, the trial court was not required to enumerate possible mitigating circumstances in its charge to the jury. *Davis v. State*, 255 Ga. 598, 612 (340 SE2d 869) (1986). The court's instructions on mitigating circumstances were sufficient. *Romine v. State* 251 Ga. 208 (10) (305 SE2d 93) (1983).

25. The trial court did not err by charging only the depravity-of-mind sub-part of the second component of § b (7) aggravating circumstance. See OCGA § 17-10-30 (b) (7). This circumstance "consists of two major components, the second of which has three sub-parts, as follows: (I) The offense of murder was outrageously or wantonly vile, horrible or inhuman (II) in that it involved (A) aggravated battery to the victim, (B) torture to the victim, or (C) depravity of mind of the defendant . . . [T]he evidence must be sufficient to satisfy the first major component . . . and at least one sub-part of the second component . . . ." *Hance v. State*, 245 Ga. 856, 860-61 (268 SE2d 339)

(1980). The trial court should instruct the jury only as to those subparts of the second component which are contended by the state. *West v. State*, 252 Ga. 156, 160 (313 SE2d 67) (1984). See also *Conklin v. State*, 254 Ga. 558 (2 c) (331 SE2d 532) (1985). The § b (7) charge given in this case was not incomplete.

26. The trial court did not err by refusing to charge at the sentencing phase the principle of OCGA § 24-8-8, regarding the necessity of corroboration of testimony by an accomplice. See Division 16 of this opinion.

27. The jury found that the murder of Eva Peppers was committed while the defendant was engaged in the commission of murder (of Warren Peppers) and armed robbery, and that the murder of Eva Peppers was "outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind." The jury found that the murder of Warren Peppers was committed while the defendant was engaged in the commission of armed robbery and that his murder was "outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind." See OCGA § 17-10-30 (b) (2) and (b) (7).

The evidence supports these findings. OCGA § 17-10-35 (c) (2). The trial court did not err by refusing to direct a verdict of life imprisonment.

28. We do not find that the sentences of death were imposed under the influence of passion, prejudice or other arbitrary factor. OCGA § 17-10-35 (c) (1). The death sentences imposed in this case for the brutal murder of two elderly people are neither excessive nor disproportionate, considering the crimes and the defendant. OCGA § 17-10-35 (b) (3). The similar cases listed in the Appendix support the two death sentences imposed in this case.

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Ford v. State*, 257 Ga. 461 (360 SE2d 258) (1987); *Romine v. State*, 256 Ga. 521 (350 SE2d 446) (1986); *Cargill v. State*, 255 Ga. 616 (340 SE2d 891) (1986); *Ingram v. State*, 253 Ga. 622 (323 SE2d 801) (1984); *Finney v. State*, 253 Ga. 346 (320 SE2d 147) (1984); *Spivey v. State*, 253 Ga. 187 (319 SE2d 420) (1984); *Roberts v. State*, 252 Ga. 227 (314 SE2d 83) (1984); *Putman v. State*, 251 Ga. 605 (308 SE2d 145) (1983); *Mincey v. State*, 251 Ga. 255 (304 SE2d 882) (1983); *Wilson v. State*, 250 Ga. 630 (300 SE2d 640) (1983); *Rivers v. State*, 250 Ga. 288 (298 SE2d 10) (1982); *Jones v. State*, 249 Ga. 605 (293 SE2d 708) (1982); *Berryhill v. State*, 249 Ga. 442 (291 SE2d 685) (1982); *Solomon v. State*, 247 Ga. 27 (277 SE2d 1) (1981); *Dick v. State*, 246 Ga. 697 (273 SE2d 124) (1980); *Jones v. State*, 243 Ga. 820 (256 SE2d 907) (1979); *Amadeo v. State*, 243 Ga. 627 (255 SE2d 718)

(1979); *Corn v. State,* 240 Ga. 130 (240 SE2d 694) (1977); *Peek v. State,* 239 Ga. 422 (238 SE2d 12) (1977); *Birt v. State,* 236 Ga. 815 (225 SE2d 248) (1976); *Pulliam v. State,* 236 Ga. 460 (224 SE2d 8) (1976); *Dobbs v. State,* 236 Ga. 427 (224 SE2d 3) (1976); *Goodwin v. State,* 236 Ga. 339 (223 SE2d 703) (1976); *Mitchell v. State,* 234 Ga. 160 (214 SE2d 900) (1975); *Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1975); *Gregg v. State,* 233 Ga. 117 (210 SE2d 659) (1974).

DECIDED DECEMBER 1, 1987 —
RECONSIDERATION DENIED DECEMBER 16, 1987.

*Ronald C. Goulart, William David Hentz,* for appellant.
*David L. Lomenick, Jr., District Attorney, James D. Franklin, Susan R. Sarratt, Assistant District Attorneys, Michael J. Bowers, Attorney General,* for appellee.