**George HUGHES, Petitioner,**

v.

**Michael A. BOWERS, et al.,
Respondent.**

**Civ. A. No. 4:88–cv–68–HLM.**

United States District Court,
N.D. Georgia,
Rome Division.

March 2, 1989.

Jerome J. Froelich, McKenney & Froelich, Atlanta, Ga., for George Hughes.

Dennis Robert Dunn, Office of State Atty. Gen., Atlanta, Ga., for Michael A. Bowers.

Sharon Douglas Stokes, Office of U.S. Atty., Atlanta, Ga., for David Evans, Jerry Mauldin and Joseph Petrovsky.

## ORDER

HAROLD L. MURPHY, District Judge.

This case is before the Court on the Magistrate's Report and Recommendation on Petitioner Hughes's Petition for Writ of Habeas Corpus. 28 U.S.C. § 2254. For the reasons set forth below, the petition shall be GRANTED.

Hughes was indicted in 1974 in Whitfield County for malice murder for killing Murphey Ridley. Attorneys Bobby Lee Cook and Sam Little represented Hughes at his trial in November 1974. The jury convicted Hughes of voluntary manslaughter and sentenced him to one year's imprisonment. Fourteen years after his conviction, Hughes has yet to begin serving his sentence. He is currently in federal custody on unrelated charges and seeks relief from his state sentence which he otherwise would serve after his federal sentence.

### I. Factual Background.

Testimony at Hughes's trial revealed the following facts. Murphey Ridley and E.D. Ridley together owned a grocery store-service station, which was located about thirty yards from E.D.'s house. E.D. was Murphey's brother and Hughes's father-in-law. Hughes and Murphey had a falling out in their friendship when a land deal between them went sour. Hughes testified he had made peace with the rest of the family, but Murphey and Murphey's son, Ralph, remained angry. In February 1974, Hughes and Ralph argued heatedly over the telephone. Then on June 17, 1974, Ralph saw Hughes at the Brindle Brothers Auto Parts Store in Whitfield County. After the two exchanged hard words, Hughes pulled a revolver from his back pocket, placed it on the counter, and said they should settle it outside. Ralph instead left the store, saying he didn't want trouble.

Ralph drove immediately to his father's house and told him about the argument and that Hughes had threatened to kill him. Murphey told his son he would take care of it. Murphey got in his pick-up truck and drove toward the home of his brother, E.D. Ralph followed in his car. Hughes also drove to E.D.'s house, apparently to explain the argument to his father-in-law. Hughes arrived first at E.D.'s store. Murphey and Ralph arrived a few minutes later at E.D.'s home and saw Hughes outside the store. Murphey drove his truck toward where Hughes was standing.

At this point the testimony diverges. Ralph testified that when Murphey reached the store, Hughes was hiding behind a tree with a shotgun. From a narrow space between the tree and the wall of the store Hughes raised his shotgun and fired twice at Murphey. One blast struck Murphey in the head and killed him.

Hughes testified he killed Murphey in self defense. According to Hughes, he fired his shotgun only after Murphey twice fired a pistol at him. Several witnesses corroborated Hughes's account, testifying that they had heard two pistol shots before the shotgun blasts. E.D. testified that he heard only the shotgun blasts.

The jury found Hughes guilty of voluntary manslaughter and sentenced him to one year's imprisonment. The conviction was affirmed on appeal. See Hughes v. State, 136 Ga.App. 927, 222 S.E.2d 645 (1975). Subsequently, Hughes filed a petition for writ of habeas corpus in state court. In April 1976, the state habeas court granted him a $2,500 bond pending the disposition of the action. The court held an evidentiary hearing, but, afterwards, never ruled on the petition.

Finally, in November 1984, while still free from state custody, Hughes filed a motion requesting final disposition of his petition. The following month, Whitfield County Superior Court Judge Coy Temples denied the petition on the merits. After

exhausting state remedies, Hughes filed the instant petition in district court.

## II. The Federal Petition.

In his amended petition, Hughes presents two grounds for issuance of the writ. First, he contends he was denied due process by the prosecution's suppression of exculpatory impeachment evidence in the possession and knowledge of the prosecution, in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Second, he contends the special prosecutor, Erwin Mitchell, who was hired by the victim's family to assist in the prosecution, had conflicting interests in his duty as agent of the state and as representative of the family.

Many of the facts relevant to these grounds are interrelated and will be set out herein together. During the trial, Defense Counsel Cook made an oral motion for an order that the prosecution be required to turn over any information in its possession as to "any life insurance policy or policies on the life of Mr. Murphey Ridley," whether any of the state's witnesses could be affected by such policies, and whether any claims had been made on them. Cook stated he had no knowledge of any policies, but if any existed, they would be important evidence to impeach the credibility of Ralph Ridley, the state's central witness and only eyewitness. Special Prosecutor Mitchell responded: "There is nothing in my file whatsoever whereby I could respond." Transcript at 249. Having heard the special prosecutor state that the prosecution had no knowledge of any such policy, the trial court denied the motion.

In his state motion for habeas corpus relief Hughes argued that the prosecution had concealed evidence of such a policy. The defense had discovered that Murphey Ridley had a $50,000 life insurance policy which paid benefits to his estate in event of accidental death. Because the policy paid benefits only upon accidental death, whether Murphey was the aggressor in the fatal incident would determine whether his estate collected $50,000. Hughes contended that suppression of the policy deprived him of evidence critical for impeachment of the state's central witness, who had a pecuniary interest in proving that Hughes was the aggressor.

The evidence submitted with the state habeas petition also demonstrates the following. The Ridley family hired Mitchell as its special prosecutor in June of 1974, shortly after the killing. In September, three months later, while serving as special prosecutor, Mitchell assisted Ms. Ridley in filling out the life insurance claim forms. Mitchell sent a "speed memo" on his firm's stationery to the insurance company, accompanied by the claim form and a copy of Murphey's death certificate. (Respondent's Exhibit No. 1 at 68–71; Petitioner's Objections to the Magistrate's Report and Recommendation, Exhibit A.).

In response to certain questions posed at the state habeas evidentiary hearing, Mitchell stated that his firm filled out the claim forms and sent the death certificate to the insurer as "an accommodation" to Ms. Ridley, and that at that time, there existed no contractual relationship with her for representation of the family for collection of the insurance proceeds. On March, 11, 1975, four months after the conviction Mitchell informed the insurer that his firm was representing the family in its claim for the proceeds. (Respondent's Exhibit No. 1 at 72.) The insurance company gave notice of denial of the claim by letter dated March 21, 1975, and, ultimately, Mitchell filed suit on behalf of Ms. Ridley for collection of the $50,000 insurance proceeds.

### A. The State Habeas Court's Findings of Fact.

■ Important findings of fact made by the state habeas court in this case are not entitled to a presumption of correctness. Title 28 U.S.C. § 2254 provides that a federal habeas court must afford state court findings of fact a presumption of correctness, *Sumner v. Mata,* 449 U.S. 539, 549, 101 S.Ct. 764, 770, 66 L.Ed.2d 722 (1981), "unless the applicant shall establish or it shall otherwise appear" that one of the conditions set forth in § 2254(d)(1)-(8) is present. In the instant case, the state ha-

beas court included the following in its findings of fact:

(1) That the alleged violation of *Brady* upon which the above-mentioned petition for Writ of Habeas was raised by oral motion before the closing of evidence during the trial by the petitioner's trial counsel, and the trial court overruled the petitioner's motion to compel the production of the insurance policy;

(2) That having knowledge of said insurance policy during the trial, the petitioner's trial counsel did not seek to cross-examine any witnesses concerning any interest in said policy;

(3) That having this oral motion denied during trial by ruling of the trial court, the petition[er] did not seek review of this alleged error upon Motion for New Trial, nor during the direct appeal of his conviction;

(4) That the insurance policy would have been relevant only for use by the defense as impeachment of Ralph Ridley, as this witness may have had an interest in the proceeds of said insurance policy;

(5) That the possible interest in the proceeds of said insurance policy would not arise to the level of materiality within the rule of *Brady* in that, within the context of the trial and evidence the possible bias against the petitioner held by Ralph Ridley would be based upon Ralph Ridley's kinship to the victim as father and son. There would be minor, if any, significance to the credibility of this witness based upon a monetary interest in the prosecution of the petitioner, who killed this witness's father;

(6) That the petitioner has failed to show prejudice from the denial of said oral motion to produce the insurance policy during trial and there is no showing that said evidence might have affected the outcome of the trial.

Respondent's Exhibit No. 1 at 32–33.

"Findings" five and six are not findings of fact but conclusions of law or are mixed questions of fact and law. They are not entitled to a presumption of correctness. Finding number two is not fairly supported by the record. *See* 28 U.S.C. § 2254(d)(8). As determined by the Magistrate, the record shows that defense counsel did not have specific knowledge of the provisions of the insurance policy, but was aware that there might have been such policy. Counsel sought merely to be confirmed in or disabused of these suspicions. His lack of knowledge in turn renders finding three unimportant: without knowledge, counsel could not have raised the issue in the motion for new trial or on appeal.[1]

Because these important findings may not be afforded a presumption of correctness, this Court shall make an independent evaluation of the facts relevant to the issues. An independent evidentiary hearing is unnecessary in this case because the state evidentiary hearing adequately developed the material facts, and the Court can rely upon the present record in resolving the issues. *See Douglas v. Wainwright,* 714 F.2d 1532, 1554 (11th Cir.1983), *vacated for reconsideration on other grounds,* 468 U.S. 1206, 104 S.Ct. 3575, 82 L.Ed.2d 874 (1984), *original disposition reaffirmed,* 739 F.2d 531 (11th Cir.1984), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985).[2] The respondent has not sought an evidentiary hearing and has argued that none is necessary for resolution of the issues.

## B. The Brady Violation.

In his first ground for habeas corpus relief, Hughes alleges that the failure of the prosecution to disclose its knowledge of

---

1. Hughes was represented in his appeals and in his original habeas petition by the same attorneys, Cook and Little, and the Court finds it unlikely that these attorneys would have failed to raise the issue on appeal had they known about it, especially given their vigorous pursuit of it in the habeas petition.

2. Evidence of two important facts does not appear in the record. Hughes contends that Mitchell represented the Ridley family in its insurance claim on a *contingency* basis. This fact, if true, would strengthen the claim of a conflict of interest and appearance of impropriety. Similarly, Hughes has contended that Ralph Ridley did share in the proceeds of the policy. Nevertheless, even without proof of these facts, on the current record, the petition should be granted.

the insurance policy constituted suppression of favorable evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He contends that evidence of the policy was favorable and material in that it would have impeached the state's central witness. The respondent replies that this evidence was not "material" under *Brady* because no reasonable probability exists that, had the policy been disclosed, the outcome of the trial would have been different.

### 1. The Legal Standard.

■ The Supreme Court in *Brady* held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." *Id.* at 87, 83 S.Ct. at 1196–97. When a defendant alleges a *Brady* violation, he or she "must demonstrate (1) that the prosecution suppressed evidence, (2) that the evidence suppressed was favorable to the defendant or exculpatory, and (3) that the evidence suppressed was material." *United States v. Arango*, 853 F.2d 818, 819 (11th Cir.1988), *quoting United States v. Severdija*, 790 F.2d 1556, 1560 (11th Cir.1986). Impeachment evidence, as well as directly exculpatory evidence, falls within the *Brady* rule. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). "Such evidence is 'evidence favorable to the accused,' *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed. 2d 481 (1985).

■ Most *Brady* claims succeed or fail upon application of the materiality requirement. The Supreme Court initially distinguished three factual situations and appeared to define for each a separate standard of materiality. *See United States v. Agurs*, 427 U.S. 97, 103–07, 96 S.Ct. 2392, 2397–99, 49 L.Ed.2d 342 (1976). First, in cases where the prosecutor knowingly used perjured information or failed to disclose that testimony used to convict the defendant was false, the standard of materiality was whether there was "any reasonable likelihood that the false evidence could have affected the judgment of the jury." *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935); *see United States v. Blasco*, 702 F.2d 1315, 1328 (11th Cir. 1983), *citing Agurs*, 427 U.S. at 103, 96 S.Ct. at 2397. Second, where the defense made a specific request for material that the prosecution suppressed, the standard was "whether the suppressed evidence might have affected the outcome of the case." *See Blasco*, 702 F.2d at 1328, *citing Agurs*, 427 U.S. at 104, 96 S.Ct. at 2398. Third, where the defendant made no *Brady* request or only a general request, and the prosecutor failed to disclose favorable evidence, the standard was whether "the omitted evidence create[d] a reasonable doubt that did not otherwise exist." *See Arango*, 853 F.2d at 827, *citing Agurs*, 427 U.S. at 112, 96 S.Ct. at 2402.

A majority of the Supreme Court in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), however, agreed upon a reformulation of two of the standards. There, Justice Blackmun announced that in a *Brady* analysis,

[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Id.* at 682, 105 S.Ct. at 3383 (Justice Blackmun joined by Justice O'Connor); *see also id.* at 685, 105 S.Ct. at 3385 (Justice White, *concurring*, joined by Chief Justice Burger and Justice Rehnquist). The Court held this test to be "sufficiently flexible to cover the 'no request,' 'general request,' and 'specific request' cases of prosecutorial failure to disclose evidence favorable to the accused." *Id.; see also United States v. Burroughs*, 830 F.2d 1574, 1577–78 (11th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1243, 99 L.Ed.2d 442 (1988); *United States v. Severdija*, 790 F.2d at 1560.

It is important to note that the *Bagley* Court did not create a uniform standard for

all three *Brady* situations. The "reasonable probability" standard replaced only two of the standards. One prior standard covered the "no request" and the "general request" situations. *See Agurs,* 427 U.S. at 107, 96 S.Ct. at 2399 ("[W]e conclude that there is no significant difference between cases in which there has been merely a general request for exculpatory matter and cases ... in which there has been no request at all.") Another covered the "specific request" situation. *Bagley* left in tact the standard for cases of perjured testimony. *See Bagley,* 473 U.S. at 685, 678–80 & nn. 8–12, 105 S.Ct. at 3381–83 & nn. 8–12.[3]

### 2. Application of the Brady Standard.

In the instant case, the respondent does not contend that the first two *Brady* requirements are not satisfied: the prosecution suppressed evidence that was in its knowledge and possession, and the evidence was favorable for impeachment.

Whether the evidence was "material" is contested. At first glance, the case appears to be a "specific request" case. The defense moved specifically for evidence of any insurance policy on Murphey's life. Thus under *Bagley,* it would appear that the "reasonable probability" standard would apply. While the Court considers the question to be close, Hughes's claim would fail under this standard. There exists a reasonable possibility, but not a reasonable probability, that had the policy been disclosed, the result of the proceeding would have been different.

This is not an ordinary *Brady* case, however, where the prosecution fails to produce evidence upon the specific request of the defense. The special prosecutor's suppression of the insurance policy in this case was knowing and willful. Because Mitchell was hired as special prosecutor in June 1974, completed and submitted the insurance forms and certificate of death in September, and participated in the trial in November, it is incredible that he was unaware of the policy when the defense inquired of its existence at trial. In fact, the respondent has never denied, through affidavit or otherwise, that Mitchell knew about it at trial. Further, at the state habeas evidentiary hearing, Mitchell apparently tried to mislead the court again, stating that he first heard of the policy when the defense made its motion at trial. The Court finds that the special prosecutor "deliberately suppressed evidence which would have impeached and refuted the testimony" against Hughes. *See Mooney,* 294 U.S. at 110, 55 S.Ct. at 341.

■ The Court finds little difference between the special prosecutor's stating to the trial court that he had no knowledge of the policy and his use of a witness to so testify. The deliberate concealment of evidence from the court and the defense, and ultimately the jury, is not the ordinary *Brady* failure to disclose evidence. It should not be evaluated by the same standard of materiality. It more closely resembles the knowing use of perjured testimony. The standard of materiality applied in cases of perjured testimony therefore should be applied to the unique facts of this case.

That standard is whether there is "any reasonable likelihood that the false testimony could have affected the jury's verdict" or whether it was "harmless beyond a reasonable doubt". *See Bagley,* 473 U.S. at 679–80 n. 9, 105 S.Ct. at 3382 n. 9. The rationale behind the standard is fully applicable. The *Bagley* Court explained:

> In *Mooney v. Holohan,* 294 U.S. 103 [55 S.Ct. 340, 79 L.Ed. 791] (1935), the Court established the rule that the knowing use by a state prosecutor of perjured testimony to obtain a conviction and the deliberate suppression of evidence that would have impeached and refuted the testimony constitutes a denial of due process. The Court reasoned that 'a deliberate deception of court and jury by the presentation of testimony known to be per-

---

**3.** *Cf. Severdija,* 790 F.2d at 1560 ("[I]n [*Bagley*], the Supreme Court appears to have announced a single standard for materiality of nondisclosed evidence, regardless of the speci- ficity of the request for disclosure."); *Arango,* 853 F.2d at 826–27 (discussing the pre-*Bagley* standards).

jured' is inconsistent with 'the rudimentary demands of justice.' *Id.* at 112 [55 S.Ct. at 341].

*Id.* at 679 n. 8, 105 S.Ct. at 3382 n. 8. The Court justified the standard "on the ground that the knowing use of perjured testimony involves prosecutorial misconduct and, more importantly, involves 'a corruption of the truth-seeking function of the trial process.'" *Bagley,* 473 U.S. at 680, 105 S.Ct. at 3382, *quoting Agurs,* 427 U.S. at 104, 96 S.Ct. at 2398. The instant case involves prosecutorial misconduct, the deliberate deception of the court, and a corruption of the truth-seeking function of the trial process. The perjured testimony standard therefore will be applied to this case.

■ Whether there is any reasonable likelihood that the insurance policy would have affected the jury's verdict, or whether its suppression was harmless beyond a reasonable doubt, is apparent. The evidence in the case was close. Hughes's claim of self-defense was corroborated by several witnesses who testified they heard pistol shots before the shotgun blasts. Hughes was charged with malice murder, but the jury convicted him only of voluntary manslaughter. The trial court instructed the jury to set the sentence and charged that Georgia law provided that "a person convicted of voluntary manslaughter shall be punished by imprisonment for not less than one nor more than 20 years in the Penitentiary." Trial Transcript at 285–86. The jury sentenced Hughes to one year's imprisonment, the least possible sentence under the law. Thus, even without the suppressed evidence, the jury chose the least possible conviction and sentence.

Ralph Ridley was the state's central witness and its only eyewitness to the fatal incident. His credibility was critical. Evidence that he stood to benefit from a $50,000 life insurance policy if Hughes was shown to be the aggressor could likely have affected the jury's verdict. "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).

Both the state habeas court and the Magistrate, however, concluded that the insurance policy was not material because Ralph Ridley's credibility was already at issue. The defense attacked his credibility on the grounds that he was the victim's son and had an acrimonious relationship with Hughes. The exploitation of these attacks on his credibility would have attenuated the importance of the policy.

Nevertheless, the added information that Ralph had substantial moneys to gain if Hughes were found the aggressor could likely have been the extra piece of evidence to sway the jury to find Hughes innocent. The suppression of the policy was not harmless beyond a reasonable doubt, and there exists a reasonable likelihood that its suppression affected the jury's verdict.

The respondent incorrectly contends that the defense knew about the policy and could have examined witnesses about it. The Court has previously determined that the defense had only certain suspicions about the existence of such a policy. After the special prosecutor, who was hired by the family, denied knowledge of it, the defense had no reason to pursue the issue further.

Accordingly, for the forgoing reasons, Hughes's petition for writ of habeas corpus on this issue shall be GRANTED.

C. The Prosecutor's Conflict of Interest.

Hughes's his second ground for relief also warrants habeas relief. Hughes alleges a denial of due process and a fundamentally unfair trial in being prosecuted by a special prosecutor who had conflicting interests as agent of the state and as representative of the victim's family. Hughes also contends the special prosecutor had a pecuniary interest in the outcome of the trial because he ultimately represented the family on its insurance claim. The respondent replies that no conflict of interest existed at the time of trial because, although Mitchell was hired by the family as a special prosecutor, he then had no contractual

relationship in connection with the insurance claim.

### 1. The Legal Standard.

The Court has located no binding decision where habeas relief has been granted on a claim of a special prosecutor's conflict of interest. The Former Fifth Circuit held that "[t]he mere participation of a special prosecutor alone is not sufficient grounds to show a denial of due process, *without some additional showing of a violation of the rules relating to prosecuting attorneys.*" *Powers v. Hauck,* 399 F.2d 322, 325 (5th Cir.1968) (emphasis added).[4] In *Powers,* the court held the denial of habeas relief proper where a special prosecutor was hired by the family of the murder victim. The court explained that the use of a special prosecutor *per se* is not improper "where the District Attorney retains control and management of the prosecution, *and the special prosecutor is not guilty of conduct prejudicial to the defendant, and the rights of the defendant are duly observed.*" *Id.* at 325 (emphasis added); *see also Wright v. United States,* 732 F.2d 1048, 1055–58 (2d Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985) (due process not violated where no evidence of specific misbehavior on part of prosecutor and where special prosecutor had no pecuniary interest in the outcome of the prosecution).

Language from *Woods v. Linahan,* 648 F.2d 973 (5th Cir. Unit B, June 1981), is also instructive. There the issue was whether the district attorney had retained control of the case. The special prosecutor performed extensive independent pretrial preparation, but the district attorney subsequently took charge of the case. The Court considered the special prosecutor's initial activities "to border on a constitutional violation" but held that the subsequent actions of the district attorney cured any such defect. The court however cautioned:

While we find that no error is shown in this case, we note our concern about the practice of using a private attorney, paid by family and friends of the victim, to prosecute persons accused of murdering a person dear to the people paying the private prosecutor. Human experience indicates that an attorney who is paid by a group of people to provide a service has some loyalty to those persons paying his fee. This loyalty may serve to prejudice the well recognized rights of a defendant accused of committing a crime. While we do not intimate that a defendant will always be prejudiced by the participation of a private attorney in a criminal prosecution, the chances are greater in this situation than where the state's attorney, or an attorney appointed and paid by the state, prosecutes the case.

*Id.* at 977. *See also Urdiales v. Canales,* 475 F.Supp. 622 (S.D.Tex.1979).

These cases provide general guidance as to the proper standard to apply. Because the facts of these cases did not warrant habeas relief, however, the court had no occasion to examine the severity of the prosecutor's misconduct or the level of prejudice that would compel the grant of habeas relief. Two Fourth Circuit cases and a Georgia case lend further guidance.

The Fourth Circuit granted habeas relief where a part-time prosecutor had conflicting interests in his roles as prosecutor and private attorney. *See Ganger v. Peyton,* 379 F.2d 709 (4th Cir.1967). The prosecutor represented the wife in a divorce action which was precipitated by an assault on her by the husband. While representing the wife, the prosecutor initiated a prosecution against the husband for the assault. On habeas review, the district court found that the prosecutor had offered to drop the assault charge if Granger made a divorce settlement favorable to the wife. *Id.* at 711–12. The Fourth Circuit reasoned:

---

**4.** A special prosecutor was permitted under Georgia law if subject to the direction and control of the district attorney. *Woods v. State,* 240 Ga. 265, 270, 239 S.E.2d 786 (1977). "The fact that the special prosecutor represents the deceased's family in civil litigation arising from his death is no ground for disqualification." *Brown v. State,* 242 Ga. 536, 250 S.E.2d 438 (1978).

Because of the prosecuting attorney's own self-interest in the civil litigation (including the possibility that the size of a fee would be determined by what could be exacted from defendant), he was not in a position to exercise fairminded judgment. . . .

*Id.* at 713. The court concluded that the incompatibility of the part-time prosecutor's conflicting interests and his misconduct rendered the trial fundamentally unfair.

In *Jones v. Richards,* 776 F.2d 1244 (4th Cir.1985), the court affirmed the denial of habeas relief where private attorneys assisted in the prosecution of a defendant for voluntary manslaughter related to a traffic accident. The same attorneys simultaneously represented the plaintiffs against the defendant in a civil action that arose from the same accident. The court held the denial of relief proper because although the attorneys had a financial interest in the outcome of the prosecution, there was no evidence that they used their positions as prosecutors to exact a more generous settlement in the civil action, and because the state prosecutor retained control of the prosecution. *Id.* at 1245–47.

In the instant case, the parties also extensively argue the applicability of *Davenport v. State,* 157 Ga.App. 704, 278 S.E. 2d 440 (1981). In *Davenport,* an attorney named Keller represented the husband in a divorce action. During this period, the wife shot the husband, the husband took out a warrant, and the wife was indicted for aggravated assault. Keller subsequently was appointed district attorney and withdrew from representation of the husband in the divorce action. An assistant district attorney handled the assault prosecution, but Keller was present at the counsel table.

The Georgia Court of Appeals held that Keller should not have participated in the assault prosecution at all, because he was cognizant of information and incidents that had occurred between the spouses in the divorce proceedings. The court found at

least an appearance of impropriety, which rendered the trial fundamentally unfair.[5]

■ From these cases the Court employs the following standard: The presence of a special prosecutor hired by the family of the victim is not constitutionally improper *per se.* To demonstrate a denial of due process, the petitioner additionally must show that the district attorney failed to retain control and management over the case, or must show evidence of specific misbehavior on the part of the prosecutor which prejudiced the defendant. Other factors to consider are whether the prosecutor is simultaneously involved in civil litigation that creates a conflict of interest with his duties as prosecutor and an appearance of impropriety, whether the prosecutor has a pecuniary interest in the outcome of the case and has misused his position as prosecutor to his benefit in the civil action, and whether the prosecutor is privy to information important to the criminal action gained through representation in the civil action.

### 2. Application of the Standard.

■ The respondent contends that there was no conflict of interest at the time of Hughes's trial because there was then no contractual relationship between the special prosecutor and the Ridley family with regard to the insurance claim. The respondent further contends, and the Magistrate concluded, that by virtue of his representation of the family, Mitchell gained no special knowledge about what had occurred between Hughes and Murphey Ridley. The Magistrate also concluded that Hughes failed to "show that there was an actual conflict of interest."

None of the cases reviewed above requires a showing of an "actual conflict of interest," as required by the Magistrate. An apparent conflict is always present in these cases, and the cases thus require a showing of specific misconduct and prejudice. Whether Mitchell had entered at the time of trial a contract to represent the

---

5. The Georgia Supreme Court noted its approval of this decision in *Frazier v. State,* 257 Ga. 690, 694, 362 S.E.2d 351 (1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988).

Ridley family in its insurance claim is not dispositive of the issue. Even so, Mitchell's actions in September would support a finding that he had entered such an agreement, despite his testimony to the contrary. At a minimum, they support a finding that he had every intention of representing them on that claim, and he in fact did so. These actions created a strong appearance of impropriety: it appears that the special prosecutor had a pecuniary interest in the outcome of the trial.

But it became more than an appearance of impropriety. An actual conflict of interest arose when the defense moved for production of insurance policies. The special prosecutor had a duty to disclose the policy but had a conflicting interest to conceal it. He chose to conceal it. By any standard, this deliberate, affirmative concealment from the court and the defense of important evidence constitutes a serious act of misbehavior which disregarded the rights of the defendant. The special prosecutor abdicated his duty to seek justice rather than conviction, and Hughes's trial was rendered fundamentally unfair.

### 3. Prejudice.

■ On the issue of prejudice, the Fourth Circuit adopted a harmless error analysis:

[W]e do not know and cannot now ascertain what would have happened if the prosecuting attorney had been free to exercise the fair discretion which he owed to all persons charged with crime in his court. '[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.' *Chapman v. California*, 386 U.S. 18 [25] 87 S.Ct. 824 [828] 17 L.Ed.2d 705, 711 (1967).

*Ganger*, 379 F.2d at 714. The Court finds appropriate and adopts this standard on this issue. As explained in the analysis of the *Brady* violation, Hughes has satisfied this standard.

ACCORDINGLY, Hughes's Petition for Writ of Habeas Corpus is GRANTED; the Writ of Habeas Corpus IS hereby ISSUED, and Petitioner Hughes shall not be held in the custody of the Defendants, unless the Defendants retry the petitioner within six months.

IT IS SO ORDERED.