851 P.2d 494

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Douglas PENNINGTON, Jr., Defendant–Appellant.**

No. 13263.

Court of Appeals of New Mexico.

March 16, 1993.

Certiorari Denied April 27, 1993.

Tom Udall, Atty. Gen., Max Shepherd, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Sammy J. Quintana, Public Defender, Bruce Rogoff, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

## OPINION

HARTZ, Judge.

Defendant appeals his conviction of child abuse resulting in death. He contends: (1) the district court should have disqualified the district attorney's office from prosecuting the case because of a conflict of interest; (2) the prosecutor's closing argument was improper; (3) an autopsy photograph should not have been admitted; (4) the evidence was insufficient to support the conviction; and (5) the trial court should have granted his request for a continuance. We affirm, although we agree with Defendant's claim that some of the prosecutor's comments during closing argument constituted improper vouching for a witness.

## BACKGROUND

Defendant was indicted on one count of child abuse not resulting in great bodily harm and one count of child abuse resulting in death. The victim of the alleged abuse was Devon Candelaria, the six-month-old son of Frances Candelaria, Defendant's girlfriend. Both charges stemmed from injuries Devon suffered while Defendant was baby-sitting him. On August 28, 1989, Devon suffered a skull fracture. On September 24, 1989, Devon lapsed into a coma caused by a head injury; he died on September 27, 1989.

Defendant's first trial ended in a mistrial when the jury could not reach a unanimous verdict on either charge. At his second trial (nine and one-half months later) the jury convicted Defendant of the charge of child abuse resulting in death and acquitted him of the other charge.

## I. Conflict of Interest.

We first consider Defendant's contention that the Third Judicial District Attorney's Office should have been disqualified from prosecuting him. About four months after the first trial Tim Kling, a private investigator who had worked on the case for Defendant, joined the district attorney's office. The district attorney instituted procedures to screen Kling from the prosecution of cases he had worked on for defense attorneys. One month later Defendant filed a motion to disqualify the entire district attorney's office from participating in prosecuting him. At a hearing on the motion Defendant testified that he had recently called Kling to obtain copies of various documents and that Kling then asked him several questions about the upcoming trial, including what his strategy would be, before Kling informed him that he now was working for the district attorney. Kling acknowledged having a conversation with Defendant but testified that he received no confidential information and that he immediately informed Defendant that he was working for the district attorney. Finding the evidence on the matter to be "evenly balanced," the district court held that Defendant had not met his burden to prove that Kling obtained confidential information after going to work for the district attorney. The district attorney did not dispute that Kling had obtained confidential information about Defendant's case when he worked for Defendant. The district court denied the motion to disqualify the office, however, because of the screening procedure established by the district attorney.

Defendant claims that the district court erred in two respects: first, in not applying a per se rule of disqualification that would prohibit the district attorney's office from handling the prosecution after the hiring of Kling; second, in assigning him the burden of proving that Kling acquired confidential information after he joined the district attorney's staff.

## A. Per Se Disqualification of District Attorney's Office.

We first consider whether an entire district attorney's staff should always be disqualified from prosecuting a defendant when one member of the staff before joining the office was involved in representing the defendant on the charges being prosecuted. In arguing for a per se rule of disqualification Defendant relies on *State v. Chambers*, 86 N.M. 383, 524 P.2d 999 (Ct.App.), *cert. denied*, 86 N.M. 372, 524 P.2d 988 (1974). In that case a district attorney's office was disqualified when one staff attorney had a conflict of interest because he had previously represented the defendant. *Id.*, 86 N.M. at 384, 524 P.2d at 1000. *Chambers* focused on the appearance of impropriety created when former defense counsel joined the district attorney's staff. *Id.* In reversing the district court's refusal to disqualify the office, *Chambers* held that the facts of the case compelled disqualification to ensure "the fair and impartial administration of justice." *Id.* at 388, 524 P.2d at 1004. The Court wrote:

> What must a defendant and his family and friends think when his attorney leaves his case and goes to work in the very office that is prosecuting him? Even though there is no revelation by the attorney to his new colleagues, the defendant will never believe that. Justice and the law must rest upon the complete confidence of the thinking public and to do so they must avoid even the appearance of impropriety. Like Caesar's wife, they must be above reproach.

*Id.* at 384–85, 524 P.2d at 1000–01 (quoting *State v. Latigue*, 108 Ariz. 521, 523, 502 P.2d 1340, 1342 (1972) (en banc)).

A year later, however, this Court ruled that in some cases a showing at an evidentiary hearing can overcome the appearance of unfairness. *State v. Mata*, 88 N.M. 560, 543 P.2d 1188 (Ct.App.1975). As in *Chambers* the defendant's former attorney had joined the district attorney's office. But an evidentiary hearing established that the defendant's former attorney had totally divorced himself from any involvement in the prosecution. Although *Mata* involved a "stale" claim—the issue was first raised in a motion for post-conviction relief—the opinion did not explicitly restrict its holding to motions for post-conviction relief.

In evaluating what, if any, of the *Chambers* holding remains good law, we look to other jurisdictions for guidance. Opinions in eight other jurisdictions have disqualified an entire prosecutor's office without requiring a showing that the employee who had assisted the defendant before joining the staff had participated in the prosecution or conveyed information to a person participating in the prosecution. *State v. Latigue; People v. Stevens*, 642 P.2d 39 (Colo.Ct.App.1981); *State v. Tippecanoe County Court*, 432 N.E.2d 1377 (Ind.1982); *State v. Ross*, 829 S.W.2d 948 (Mo.1992) (en banc); *Fitzsimmons v. State*, 116 Neb. 440, 218 N.W. 83 (1928); *People v. Shinkle*, 51 N.Y.2d 417, 434 N.Y.S.2d 918, 415 N.E.2d 909 (1980); *State v. Cooper*, 63 Ohio Misc. 1, 409 N.E.2d 1070 (1980); *State v. Stenger*, 111 Wash.2d 516, 760 P.2d 357 (1988) (en banc). *Cf. Love v. Superior Court*, 111 Cal.App.3d 367, 168 Cal.Rptr. 577 (1980) (disqualifying the six attorneys in the major crimes section of the district attorney's office). The principal concerns expressed in these cases, as in *Chambers*, are the appearance of impropriety and the potential for an undiscoverable breach of confidence when a defendant's former confidante joins the enemy camp.

Even in the above jurisdictions, however, it is not clear that the courts would always require disqualification of an entire district attorney's office on the ground that one employee had worked for the defendant on a related matter. Most of the cases involved special circumstances. In two of the cases the attorney causing the disqualification was a part-time prosecutor whose private firm continued to represent the defendant in related civil litigation. *State v. Ross; Fitzsimmons v. State*. In four of the cases the attorney who had worked for the defendant had become the district attorney or chief assistant. *State v. Latigue; State v. Tippecanoe County Court; People v. Shinkle; State v. Stenger*. *Tippecanoe*, 432 N.E.2d at 1379 and *Stenger*, 760

P.2d at 360–61, explicitly stated that the entire office need not be disqualified just because a deputy in the office had represented the accused in the same matter. Although *Latigue* emphasized that the decision did not rest "on the fact that the attorney involved here is the County Attorney's chief deputy," *id.* at 1342, a later decision in that jurisdiction has suggested that whether to disqualify an entire office will depend on the specifics of the case, *Turbin v. Superior Court,* 165 Ariz. 195, 797 P.2d 734 (Ct.App.1990). In the remaining two cases the decisions were by a two-to-one majority, *People v. Stevens,* and by a single-judge trial court, *State v. Cooper.*

The great majority of jurisdictions have refused to apply a per se rule disqualifying the entire prosecutor's staff solely on the basis that one member of the staff had been involved in the representation of the defendant in a related matter. In their view the entire staff ordinarily need not be disqualified from prosecuting the defendant if the staff member who had previously worked for the defendant is isolated from any participation in the prosecution of the defendant. *United States v. Caggiano,* 660 F.2d 184 (6th Cir.1981); *United States v. Goot,* 894 F.2d 231 (7th Cir.1990); *Jackson v. State,* 502 So.2d 858 (Ala.Crim.App.1986); *Upton v. State,* 257 Ark. 424, 516 S.W.2d 904 (1974); *People v. Lopez,* 155 Cal.App.3d 813, 202 Cal.Rptr. 333 (1984) (applying new state statute); *State v. Bunkley,* 202 Conn. 629, 522 A.2d 795 (1987); *State v. Fitzpatrick,* 464 So.2d 1185 (Fla.1985); *Frazier v. State,* 257 Ga. 690, 362 S.E.2d 351 (1987); *State v. Dambrell,* 120 Idaho 532, 817 P.2d 646 (1991); *State v. McKibben,* 239 Kan. 574, 722 P.2d 518 (1986); *Summit v. Mudd,* 679 S.W.2d 225 (Ky.1984); *State v. Bell,* 346 So.2d 1090 (La.1977); *Young v. State,* 297 Md. 286, 465 A.2d 1149 (1983); *Pisa v. Commonwealth,* 378 Mass. 724, 393 N.E.2d 386 (1979); *Collier v. Legakes,* 98 Nev. 307, 646 P.2d 1219 (1982); *State v. Camacho,* 329 N.C. 589, 406 S.E.2d 868 (1991); *Commonwealth v. Harris,* 501 Pa. 178, 460 A.2d 747 (1983); *State v. Cline,* 122 R.I. 297, 405 A.2d 1192 (1979); *State v. Smart,* 278 S.C. 515, 299 S.E.2d 686 (1982); *Mattress v.*

*State,* 564 S.W.2d 678 (Tenn.Crim.App. 1977); *State ex rel. Eidson v. Edwards,* 793 S.W.2d 1 (Tex.Crim.App.1990) (en banc); *State v. Miner,* 128 Vt. 55, 258 A.2d 815 (1969); *see generally* Annotation, T.J. Griffin, *Disqualification of Prosecuting Attorney on Account of Relationship with Accused,* 31 A.L.R.3d 953 (1970 & Supp.1992).

■ We join that majority in rejecting a per se rule of disqualification of the entire prosecutorial staff when the disqualified member of the staff is isolated from the prosecution of the defendant. Instead we leave to the sound discretion of the district court whether the circumstances of the specific case require disqualification of the entire staff.

There are several reasons for rejecting a per se rule. First, if a district attorney has issued directives to isolate a member of the staff from the prosecution of a particular case, one should not presume that secret violations of the directives will occur. A prosecutor's sole duty is to do justice. A prosecuting attorney has no financial incentive to obtain prohibited information. Of course, prosecuting attorneys make mistakes, even mistakes that violate ethical rules of conduct. But the sort of misconduct one must presume to justify a per se rule is that prosecutors would violate a clear mandate (that the disqualified employee be isolated from all involvement in the prosecution) and then lie about such violation. We have no reason to presume that such egregious misconduct would occur in the district attorney offices in this state. The possibility of such despicable behavior is too slight to justify a per se rule.

In saying this we are not denigrating the importance of appearances. There may well be circumstances in which concern about the appearance of impropriety would justify disqualification of the entire district attorney's staff. If the prosecution is of such great political importance that the result could affect the political future of a district attorney, one might question whether the pressures on the prosecutorial staff are any less influential than those on

private counsel. Other factors that might suggest a need for disqualification are evidence of bad faith in hiring of the employee who had worked for the defendant, *see United States v. Caggiano,* (district court made finding of good faith in hiring defendant's former attorney), lack of candor by the prosecutor's office in related matters, or simply prior evidence of overzealousness by members of the prosecutor's staff. We can rely on the district courts, in the exercise of their sound discretion, to disqualify an entire office whenever there are substantial reasons to doubt that internal screening procedures will protect the defendant.

A second reason to reject a per se rule of disqualification is that such a rule could seriously impede a district attorney's efforts to acquire the best possible employees. A per se rule could foreclose the hiring of persons with substantial recent local experience in criminal defense work. Under a per se rule, hiring such an attorney would entail the cost of employing a special prosecutor to handle every case in which the new staff member had worked for a defendant. Even if the financial expense were not a major consideration, the district attorney may not be pleased about having important cases prosecuted by people who do not have the criminal-law experience or the knowledge of local culture (including the modes of thinking of the local judiciary and juries) possessed by staff attorneys. The district attorney might find it preferable to hire a less-qualified person than to incur such problems. One court has suggested that this difficulty could be resolved by delaying employment of the new staff member until completion of the prosecution of the defendant for whom the new staff member had worked. *Dambrell,* 817 P.2d at 653. But in practice that would mean that the prospective employee would need to refrain from involvement in any criminal cases for an indefinite period while the district attorney's office completes the prosecution of the prospective employee's former clients. The financial burden this could impose on the prospective employee might deter that person from seeking a position with the district attorney's office. *See State v. Jones,* 180 Conn. 443, 429 A.2d 936, 942–43 (1980) (Per se rule "would result in many unnecessary withdrawals, limit mobility in the legal profession, and restrict the state in the assignment of counsel where no breach of confidentiality has in fact occurred."), *overruled in part on other grounds, State v. Powell,* 186 Conn. 547, 442 A.2d 939, 944 (1982).

The ABA Committee on Professional Ethics relied on the above two reasons in ruling that lawyers in a government office are not necessarily disqualified from handling matters in which another lawyer in the office had participated while in private practice. The committee wrote:

> When the disciplinary rules of Canons 4 and 5 mandate the disqualification of a government lawyer who has come from private practice, his governmental department or division cannot practicably be rendered incapable of handling even the specific matter. Clearly, if D.R. 5–105(D) were so construed, the government's ability to function would be unreasonably impaired. Necessity dictates that government action not be hampered by such a construction of D.R. 5–105(D). The relationships among lawyers within a government agency are different from those among partners and associates of a law firm. The salaried government employee does not have the financial interest in the success of departmental representation that is inherent in private practice. This important difference in the adversary posture of the government lawyer is recognized by Canon 7: the duty of the public prosecutor to seek justice, not merely to convict, and the duty of all government lawyers to seek just results rather than the result desired by a client. The channeling of advocacy toward a just result as opposed to vindication of a particular claim lessens the temptation to circumvent the disciplinary rules through the action of associates. Accordingly, we construe D.R. 5–105(D) to be inapplicable to other government lawyers associated with a particular government lawyer who is himself disquali-

fied by reason of D.R. 4–101, D.R. 5–105, D.R. 9–101(B), or similar disciplinary rules. Although vicarious disqualification of a government department is not necessary or wise, the individual lawyer should be screened from any direct or indirect participation in the matter, and discussion with his colleagues concerning the relevant transaction or set of transactions is prohibited by those rules.

ABA Comm. on Professional Ethics, Formal Op. 342, 62 A.B.A.J. 517, 521 (1976). The conclusion in this ethics opinion was reaffirmed in the ABA comment to Model Rules of Professional Conduct, Rule 1.11(c)—adopted by the New Mexico Supreme Court as SCRA 1986, 16–111(C) (Repl.Pamp.1991). The comment states that when a lawyer serving as a public employee is disqualified from participating in a matter because of prior participation in the matter while in private practice, other lawyers in the same government agency are not necessarily prohibited from participating in the matter. SCRA 16–111, ABA cmt. We find it significant that neither Formal Opinion 342 nor the comment to Rule 1.11(c) had been published when *Chambers* was decided by this Court.

Moreover, insofar as disqualification of the entire staff of a district attorney is justified solely because of concern for the appearance of unfairness, the appointment of a special prosecutor cannot fully allay that concern. Unless the special prosecutor begins the investigation from scratch, even a special prosecutor of absolute integrity cannot avoid the possibility that material supplied by the district attorney's office or police agencies has been contaminated by disclosures from the disqualified employee. We have found three cases in which the defendant has raised an ethical challenge to the prosecution despite the substantial withdrawal from participation in the prosecution by the government office in which the defendant's former attorney worked. *State v. Miranda,* 100 N.M. 690, 675 P.2d 422 (Ct.App.1983); *State v. Reid,* 104 N.C.App. 334, 410 S.E.2d 67 (1991); *State v. Miner.* We concur in the following observation by the Rhode Island Supreme Court: ·

Even in those states where one prosecutor's office has been disqualified, the necessity still exists for representatives of that office, as in *State v. Latigue, supra,* to work closely with a special prosecutor in whose integrity (and that of the former counsel for the accused) reliance must ultimately have been reposed. Thus, we believe that transferring responsibility from one office to another, or the appointment of a special prosecutor, provides a purported remedy which is more cosmetic than substantial.

*Cline,* 405 A.2d at 1207.

We conclude that the per se rule of disqualification expressed in *Chambers* cannot withstand the great weight of contrary authority and the cogent reasons supporting that authority. We expressly overrule *Chambers* to the extent that it can be read as always requiring disqualification of an entire district attorney's office from prosecuting a defendant solely on the ground that one employee of the office had worked for defendant on the same matter. When the disqualified employee is effectively screened from any participation in the prosecution of the defendant, the district attorney's office may, in general, proceed with the prosecution. We leave to the sound discretion of the district court, however, the determination of whether under the specific facts of a case, substantial concerns about the appearance of fairness require that the district attorney's office be disqualified from prosecuting the defendant despite the adoption by that office of effective measures to screen any disqualified employees.

### B. Burden of Proof and Application to This Case.

■ Before turning to the facts of this case, we attempt to clarify the allocation of the burden of persuasion on the issues governing disqualification. First, the defendant has the burden to establish that a member of the district attorney's staff is disqualified from participation in the prosecution. *See Leon, Ltd. v. Carver,* 104 N.M. 29, 32, 715 P.2d 1080, 1083 (1986) (disqualification of opposing counsel in civil case);

*Ulibarri v. Homestake Mining Co.,* 112 N.M. 389, 395, 815 P.2d 1179, 1185 (Ct.App. 1991) (party alleging the affirmative has burden of persuasion). We note that a defendant can meet this burden by proving, as in this case, that the staff member had previously worked for the defendant on the same matter. When the defendant does not meet this burden, the district court cannot disqualify anyone in the district attorney's office.

Once a defendant has carried this burden, the state has the burden to establish that staff members working on the prosecution have been effectively screened from contact with the disqualified staff member concerning the case. This burden is appropriately on the state because it has unique access to the pertinent information. Imposition of this burden on the state also follows from a presumption that employees of a law office share confidences with respect to matters being handled by the office. *See United States v. Goot,* 894 F.2d at 234–35; *cf. State v. Martinez,* 100 N.M. 532, 535, 673 P.2d 509, 512 (Ct.App.1983) (lawyer seeking to remain in case has burden to show that knowledge of confidential matters is merely imputed, not actual). If the state does not meet this burden, the entire district attorney's office must be disqualified.

When both the defendant and the district attorney have met their respective burdens, the matter rests in the sound discretion of the court. Even if the disqualified employee is effectively screened from the prosecution team, special circumstances may persuade the district court that an appearance of impropriety requires disqualification of the entire office. This decision will depend on a variety of factors, some of which have been alluded to above. The local district court is in a far better position than an appellate court to evaluate and weigh the evidence on the matter. The formal allocation of a burden of persuasion serves no purpose in this exercise of discretion.

In the present case the district court's only reference to the burden of persuasion was in the following Finding No. 10 proposed by the State and adopted by the court:

> The Defendant is the proponent of a request to have this Court find that since the employment of the investigator by the District Attorney's Office, the investigator again acquired confidential information from the Defendant; and as the proponent of that finding carries the burden of proof and the evidence is evenly balanced and the Court declines to find that the investigator acquired confidential information again after he went to work at the Dsitrict [sic] Attorney's Office.

Defendant argues in his appellate brief that this finding implies that the district court thought that Defendant had the burden of proving actual prejudice from Kling's conflict of interest. We do not so read the finding. What the district court appears to be saying is that if the telephone conversation between Defendant and Kling is alleged to be an independent ground for disqualification of Kling, then Defendant had the burden of proving that his version of the telephone conversation was correct. We agree with that view. We note, however, that Kling was disqualified from participation in the prosecution regardless of what the district court found with respect to the telephone conversation. Kling's prior work for Defendant was all that was needed to disqualify him. Also, even if the district court believed Defendant's version of the conversation, the district attorney's office would not necessarily be disqualified from prosecuting Defendant if Kling was adequately screened from those handling the prosecution. In short, the district court's finding with respect to the conversation was not dispositive on the issue of disqualification of the district attorney's office. On the other hand, insofar as the testimony about the telephone conversation may have shown that Kling was untrustworthy and unlikely to comply with screening procedures, it was a proper factor for the district court to weigh in the exercise of its discretionary authority to disqualify the district attorney's office.

Now we turn to the critical finding and conclusion of the district court.

The district court adopted the State's proposed Finding No. 9 and Conclusion No. 5, which state:

Finding No. 9.

The following precautions have been taken by the District Attorney for the Third Judicial District to ensure that Inv. Kling does not share any information which he may have acquired in his capacity as a private investigator and as an investigator with the Public Defender's Office, with the District Attorney and his staff:

a) That issue was discussed during the interview process and that formed the basis for developing the procedural safeguards.

b) All of the files that Inv. Kling worked on for the defense prior to his employment are color coded.

c) There are to be no conversations between the investigator and anyone else, regarding this case and any case that Mr. Kling worked on for the defense, and there have been no conversations between the investigator and anyone else on this case.

d) The attorneys are instructed to ask the investigator to leave if they are going to discuss this case.

e) The investigator may not even review any of the State's files on which he worked as an investigator for the defense.

Conclusion No. 5.

[T]he appearance of unfairness as raised under *Chambers* is dissipated upon the Court holding an evidentiary hearing and entering findings as the Court has done in Findings of Fact Nos. 9 and 10.

We hold that the district court's findings and conclusions suffice to establish that Kling was effectively screened from the prosecution of Defendant. *See Jackson,* 502 So.2d at 867–68 (quoting findings made by trial court on remand). Although the hearing on Defendant's disqualification motion was conducted well before trial and there may have been subsequent breaches of the screening procedures, Defendant waived any claim of subsequent breaches by never requesting a further evidentiary hearing. To preserve an issue for appeal, a defendant ordinarily must invoke a ruling on the issue by the trial court. *See State v. Gonzales,* 110 N.M. 218, 227, 794 P.2d 361, 370 (Ct.App.1990), *aff'd,* 111 N.M. 363, 805 P.2d 630 (1991); SCRA 1986, 12–216(A).

Also, we find no abuse of discretion in the district court's determination that any appearance of unfairness was "dissipated." We therefore affirm the district court's refusal to disqualify the district attorney's office.

## II. Prosecutorial Misconduct During Final Argument.

According to Defendant, the prosecutor spoke improperly on two occasions during closing argument: first, by improperly shifting the burden of proof; second, by improperly injecting her own credibility and the authority of her office into the case by vouching for the credibility of a State's witness.

### A. Shifting the Burden of Proof.

■ In her closing remarks the prosecutor referred to Defendant's failure to call any medical experts to support his theory of the cause of Devon's brain injury. Defendant twice objected to this line of argument; the trial court sustained the objections and admonished the prosecutor. The statements—that Defendant could have subpoenaed his own medical experts and that jurors should "ask yourselves why he didn't"—did not shift the burden to Defendant to prove his innocence. The statements are comments on Defendant's failure to call witnesses who may have supported his theory. Such comments are permissible. *See State v. Gonzales,* 112 N.M. 544, 550, 817 P.2d 1186, 1192 (1991); *State v. Aaron,* 102 N.M. 187, 192, 692 P.2d 1336, 1341 (Ct.App.1984).

### B. Vouching for Witness.

In rebuttal argument, the prosecutor said:

You know, if Frances Candelaria wanted to lie, why didn't she make [Defen-

dant] out to be this horrendous monster? This horrible person? "Yes, he used to pull the baby from me, he used to do this, he used to do that." She didn't. She didn't make him out to be that monster. I mean, that would have made a good story. But she didn't. She said: "I never saw him strike the baby in my presence. I saw some bruises on his bottom once, and I questioned him about it."

And I have a duty here, members of the jury, to present to you as many facts as possible. And I am, I am obligated not to present to you something I know to be a lie, that I know to be a lie. I have a duty to not allow someone to perjure themselves if I have knowledge of that. And I would not do that.

This witness is presented before you, and she mentions to you about the bruises on the bottom. And she tells you how she questioned him about it ... But that's the only incident she sees. That's the only thing that she observes during the time that they're living together, that she actually talks to him about, and he admits having done.

If she wanted to lie, why not make up some more? Why not make him out to be a monster? Because's she not lying. She's telling you as she saw it.

▋ Both defense counsel and the prosecutor have considerable latitude in closing arguments. *State v. Diaz*, 100 N.M. 210, 215, 668 P.2d 326, 331 (Ct.App. 1983); *State v. Pace*, 80 N.M. 364, 371, 456 P.2d 197, 204 (1969). This latitude, however, is not boundless. It does not encompass the practice of vouching for the credibility of a witness, either by invoking the authority and prestige of the prosecutor's office or by suggesting the prosecutor's special knowledge. *See Diaz*, 100 N.M. at 213–14, 668 P.2d at 329–30; SCRA 1986, 16–304(E) (Repl.Pamp.1991) (in trial, an attorney may not "assert personal knowledge of facts in issue ... or state a personal opinion, not supported by the evidence as to the ... credibility of a witness."); *United States v. Wallace*, 848 F.2d 1464, 1473 (9th Cir.1988); ABA Standards for Criminal Justice Standard 4–7.8 (2d ed. 1980). The

prohibition against vouching stems from concerns that such comments may lead a jury to rest its decision on the prosecutor's personal integrity or authority and not on the evidence presented. *Diaz*, 100 N.M. at 213, 668 P.2d at 329. When the prosecutor in this case referred to her ethical obligations and then asserted that the witness was not lying, she created such a risk.

Was there any justification for the prosecutor's vouching? New Mexico recognizes the "invited-response" doctrine under which defense counsel's closing argument may "open the door" to comments by the prosecutor that otherwise would be reversible error. *See State v. Cordova*, 100 N.M. 643, 647, 674 P.2d 533, 537 (Ct.App.1983); *State v. Jaramillo*, 88 N.M. 60, 63, 537 P.2d 55, 58 (Ct.App.), *cert. denied*, 88 N.M. 318, 540 P.2d 248 (1975). The State argues that the prosecutor's statements were permissible invited responses because defense counsel's closing argument attacked the integrity of the prosecutor and the credibility of a State's witness. In support of this claim the State cites several passages from the closing argument. We quote each statement that the State relies on and then provide the context in which it was made:

(1) Why do they twist things? You know they've done that throughout the course of this thing.... They don't want you to think about the facts.

The prosecutor had asked Frances Candelaria whether Defendant attended Devon's funeral. Defense counsel was arguing that this question was an attempt to mislead the jury because the prosecutor knew that Defendant was under a court order to stay away from the funeral.

(2) Don't be fooled by that, you know, again it's a twist of the evidence here.... Don't be fooled with that.

Defense counsel was reviewing the medical evidence. He appears to be saying that the prosecutor mistakenly argued that Devon's hematoma from the first injury had gone away by the time of the second injury.

(3) We don't know about Ms. Candelaria.... You know, we sure would like to know how well she would do [on a poly-

graph test] because who's the one with all the lies? Who's the one that came up here and told you all the lies?

Defense counsel had discussed at length Defendant's willingness to take lie detector tests. He then accused Frances Candelaria of lying about Defendant's suggesting that she have an abortion and about Defendant's once having spanked Devon hard enough to create bruising.

We reject the application of the invited-response doctrine to justify the prosecutor's statements. Although defense counsel accused the prosecutor of attempting to mislead the jury and accused Frances Candelaria of lying, he did not accuse the prosecutor of suborning perjury by Frances Candelaria. The prosecutor could have responded to the first accusation by explaining how her presentation was not intended to mislead and could have responded to the second accusation by pointing to the evidence supporting the witness's credibility. But the prosecutor's comments went well beyond such a permissible response. An attack on the credibility of a witness cannot justify vouching by the prosecutor. Otherwise, prosecutors could vouch for every witness who provides disputed testimony.

Thus, the invited-response doctrine does not apply here. We should emphasize, however, that even when it does apply it should not be understood "as suggesting judicial approval [—or] encouragement—of response-in-kind that inevitably exacerbates the tensions inherent in the adversary process ... [T]he issue is not the prosecutor's license to make otherwise improper arguments, but whether the prosecutor's 'invited response,' taken in context, unfairly prejudiced the defendant." *United States v. Young*, 470 U.S. 1, 12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). To put the matter bluntly, even when application of the invited-response doctrine leads to affirmance of a conviction, overreaction by a prosecutor can still justify disciplinary sanctions (as can improper comments by defense counsel).

Having recognized the impropriety of the prosecutor's argument, we next address whether the error requires reversal. Of critical importance is defense counsel's failure to object to the vouching during rebuttal. Instead, after the jury retired for deliberations, counsel moved for a mistrial "just for the record." The district court determined that the rebuttal comments were permissible under the invited-response doctrine and rejected the motion for a mistrial.

The proper procedure would have been to object to the statements at the time the prosecutor made them. *See State v. Hernandez*, 115 N.M. 6, n. 1, 846 P.2d 312, n. 1 (1993); *State v. Victorian*, 84 N.M. 491, 495, 505 P.2d 436, 440 (1973); *State v. Peden*, 85 N.M. 363, 365, 512 P.2d 691, 693 (Ct.App.1973). A timely objection allows the trial court to assess the prejudicial nature of the statements and take curative steps, such as admonishing the prosecutor. *See State v. Clark*, 105 N.M. 10, 17, 727 P.2d 949, 956 (Ct.App.) (error, if any, cured by sustaining of objections and admonitions), *cert. denied*, 104 N.M. 702, 726 P.2d 856 (1986). Even though the prosecutor made the statements near the end of her rebuttal argument, defense counsel had adequate time to object. An admonition from the district court could have particular impact in curing the type of error committed by the prosecutor here. A judicial dressing down of the prosecutor would undercut her authority and prestige, thereby blunting any possible prejudice arising from the improper invocation of that authority and prestige.

Absent a timely objection, we review prosecutorial comments for fundamental error. *State v. Clark*, 108 N.M. 288, 296, 772 P.2d 322, 330 (1989); *see United States v. Young* (review for "plain error"); *United States v. Caucci*, 635 F.2d 441, 448 (5th Cir. Unit B) (no objection to prosecutor's comments when made; motion for mistrial after conclusion of summation), *cert. denied*, 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 108 (1981); *cf. Peden*, 85 N.M. at 365, 512 P.2d at 693 (motion for mistrial based on improper final argument will not be reviewed on appeal because motion was made after jury retired). Fundamental er-

ror occurs when the defendant's innocence appears indisputable or guilt is so doubtful that allowing the conviction to stand would shock the conscience. *Gonzales*, 112 N.M. at 551, 817 P.2d at 1193; *see United States v. Young*, 470 U.S. at 16, 105 S.Ct. at 1047 (plain error if error "undermine[d] the fundamental fairness of the trial and contribute[d] to a miscarriage of justice").

Thus, we must look to the context in which the statements were made. *See State v. Ramming*, 106 N.M. 42, 738 P.2d 914; *United States v. Young*. Frances Candelaria's credibility was neither the crux of the prosecution's case against Defendant nor the primary focus of either counsel's closing statement. The prosecutor's closing statement consisted primarily of a review of the medical evidence presented during trial and a discussion of how that evidence disputed Defendant's explanation that Devon had simply fallen out of his bassinet. The only bearing Frances Candelaria's testimony had on the events of September 24, 1989, was to establish that Devon was fine when she left him in Defendant's care that morning. Two other witnesses testified to Devon's condition that morning and Defendant did not dispute that testimony. Defense counsel's argument also focused on medical evidence, suggesting that it was consistent with Defendant's version of events. He challenged Frances Candelaria's veracity on only two matters. First, she testified that Defendant had asked her to get an abortion. (She was pregnant at the time of Devon's death.) Yet, she also testified that Defendant soon changed his mind. Second, she testified that Defendant had once admitted spanking Devon too hard. Whatever impact this testimony had on the jury, however, was countered in large part by her testimony that Defendant was "really good" with the baby. Given the nature of the evidence and the final argument in this case, we cannot say that the improper vouching by the prosecutor was likely to have had a significant impact on the jury's deliberations, much less that it undermined the fundamental fairness of the trial. *See Clark*, 105 N.M. at 16–17, 727 P.2d at 955–56.

### III. Other Claims.

■■■ Defendant contends that the district court erred in admitting an unduly prejudicial autopsy photograph depicting Devon's skull fractures. SCRA 1986, 11–403, permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." We reverse a ruling under SCRA 11–403 only for an abuse of discretion. *See State v. Lopez*, 105 N.M. 538, 544, 734 P.2d 778, 784 (Ct.App.1986); *State v. Ho'o*, 99 N.M. 140, 144, 654 P.2d 1040, 1044 (Ct. App.) (autopsy photographs), *cert. denied*, 99 N.M. 148, 655 P.2d 160 (1982). The photograph of Devon's skull corroborated the medical testimony and was relevant to the issue of whether Devon's head injuries could have been caused by a fall. We find no abuse of discretion.

■■■ Next, Defendant argues that the evidence was insufficient to support a verdict. We disagree. Three witnesses testified that they had seen Devon that morning and that the baby appeared to be fine. Thereafter Defendant had exclusive custody of Devon. When emergency medical technicians arrived at Defendant's apartment in the early afternoon, Devon was unconscious and was not breathing. Devon remained in a coma until he died three days later. Three doctors—Devon's pediatrician, the medical examiner who performed the autopsy, and a neurosurgeon who treated Devon—testified that Devon's injuries were the result of blunt trauma. Devon's pediatrician testified that the injury was inconsistent with a fall from a bassinet. The pediatrician and the neurosurgeon testified that, in all probability, Devon lapsed into a coma shortly after he sustained the trauma. Although the State presented no direct evidence that Defendant was the source of Devon's fatal injuries, a guilty verdict may be based on circumstantial evidence. *See State v. Aguayo*, 114 N.M. 124, 835 P.2d 840 (Ct. App.1992) (child abuse resulting in death); *State v. Sheldon*, 110 N.M. 28, 791 P.2d 479 (Ct.App.) (same), *cert. denied*, 110 N.M. 44, 791 P.2d 798, and 498 U.S. 969, 111

S.Ct. 435, 112 L.Ed.2d 418 (1990). The evidence presented at trial was sufficient for a reasonable person to conclude beyond a reasonable doubt that Defendant caused Devon's death. *See State v. Brown*, 100 N.M. 726, 676 P.2d 253 (1984).

■ Finally, Defendant claims that the district court should have granted a continuance while he waited to see if he should hire another investigator. Yet Defendant has made no suggestion that he was prejudiced in any way by the denial of his motion for a continuance. In the absence of prejudice, there is no ground for reversal. *See State v. Perez*, 95 N.M. 262, 620 P.2d 1287 (1980).

**IV. Conclusion.**

For the above reasons we affirm the judgment of the district court.

IT IS SO ORDERED.

BIVINS, J., concurs.

CHAVEZ, J., specially concurring.

CHAVEZ, Judge (specially concurring).

I agree with the rule of law pertaining to vicarious disqualification announced in the majority opinion. I also concur in the majority's application of that rule to the facts of Defendant's case. I disagree with the majority's emphasis, however, on factors arising in relation to government employment as a countervailing force to the appearance of impropriety when it comes to questions of disqualification of a prosecuting agency's office.

This Court gave paramount importance to the appearance of impropriety when deciding *Chambers* nineteen years ago. I believe that the principles underlying that public policy consideration are no less important today. It is just as important to ensure that a defendant receives a fair trial and that the public maintains its trust and confidence in the fair and impartial administration of justice. In a criminal prosecution where a defendant's lawyer has had substantial involvement in the ongoing defense and then joins the prosecutor's office, special care should be taken with appear-

ances. The defendant and society should not be left with the impression that the already enormous power of the state is being unfairly bolstered for use against the individual. Such public perception has the potential for fostering cynicism and disrespect for our system of justice.

This is not to say that other policy considerations should be ignored in determining when vicarious disqualification is appropriate. As the majority stresses, the need to attract competent people to government employment and the need of government agencies to perform their functions without undue burdens are certainly important. It is my belief, however, that trial courts should err on the side of preserving citizens' confidence in our criminal justice system when deciding questions of disqualification due to conflict of interest. *See Turbin*, 797 P.2d at 734 (concern for appearance of impropriety outweighed trial court's concern that vicarious disqualification would have impeded movement of attorneys between county offices and 'paralyzed' judicial system of county).

Although I agree with the majority's holding and concur in the result, for the foregoing reasons I would place greater emphasis on the appearance of unfairness as an independent factor justifying vicarious disqualification.