747 N.W.2d 437 (2008)
275 Neb. 570
STATE of Nebraska, appellee,
v.
Chad KINKENNON, appellant.
No. S-07-654.
Supreme Court of Nebraska.
April 24, 2008.
*440 Mitchel L. Greenwall, of Yeagley, Swanson & Murray, L.L.C., Kearney, for appellant.
Jon Bruning, Attorney General, and George R. Love for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
GERRARD, J.

NATURE OF CASE
Chad Kinkennon was convicted in a bench trial of one count of possession of methamphetamine with the intent to deliver[1] and one count of possession of cocaine.[2] Kinkennon argues on appeal that the district court erred in denying his motion for appointment of a special prosecutor, based on an alleged conflict of interest. Kinkennon also argues that the district court erred in imposing excessive sentences, and in the manner in which the court instructed a witness regarding that witness' Fifth Amendment rights. For the following reasons, we affirm the judgment of the district court.

FACTS
Kinkennon was charged by amended complaint in the district court for Buffalo County with one count of possession of meth-amphetamine with intent to deliver, one count of possession of a controlled pharmaceutical substance without a prescription, one count of possession of a controlled substance other than marijuana without a valid prescription, and possession of cocaine. The charges against *441 Kinkennon were based on evidence seized in a search of Kinkennon's residence. That evidence included, among other things, a digital scale and several small baggies containing methamphetamine and cocaine residue.

ALLEGED CONFLICT OF INTEREST
On August 4, 2006, the court appointed Heather Swanson-Murray, of the law firm Yeagley Swanson Murray, L.L.C., to serve as counsel for Kinkennon. Yeagley Swanson Murray rep resented Kinkennon from that date forward, through his May 10, 2007, sentencing and the filing of the present appeal on June 8. Mandi Schweitzer was employed as an associate attorney with Yeagley Swanson Murray at the time Swanson-Murray was appointed to represent Kinkennon. Schweitzer remained an employee of the firm through January 19, 2007; on January 22, she began employment with the Buffalo County Attorney's office as a deputy county attorney.
On February 26, 2007, Kinkennon filed a motion for appointment of a special prosecutor. In his motion, Kinkennon alleged that "[a] conflict of interest exist[ed] within the Buffalo County Attorney's office by virtue of ... Schweitzer's previous association with Yeagley Swanson Murray ... and current association with [the] Buffalo County Attorney's office."
At the hearing on the motion for appointment of a special prosecutor, three affidavits relating to Schweitzer's knowledge of and participation in Kinkennon's case were offered and received into evidence. Swanson-Murray, in her affidavit, averred, among other things, that she "recall[ed] discussing ... Kinkennon's case, including pretrial motions and trial strategy[,] with all of the attorneys in the office, including ... Schweitzer prior to January 19, 2007." Swanson-Murray also averred that she specifically recalled "discussing with ... Schweitzer the propriety of filing a motion to suppress in ... Kinkennon's case, as well as discussing legal issues surrounding the use of a confidential informant." Similarly, another associate attorney with Yeagley Swanson Murray averred that he "recall[ed] discussions regarding... Kinkennon's case within the office that took place prior to January 19, 2007," and that "Schweitzer, ... Swanson-Murray and [he] were present at the office during these discussions."
Schweitzer, in her affidavit, denied ever discussing Kinkennon's case with any attorney while she was employed with Yeagley Swanson Murray. Schweitzer averred that she had no contact with Kinkennon, did not review or examine his file, and did not even know his file existed. Schweitzer further averred that she "was not consulted by any other attorneys in the firm with regard to ... Kinkennon in any way" and that "[a]ny other representations by anyone else to the contrary are false." Finally, Schweitzer averred that since joining the Buffalo County Attorney's office, she had not participated in the prosecution of Kinkennon's case, and that she did not have any knowledge of the matter.
The district court denied Kinkennon's motion for appointment of a special prosecutor, and the case proceeded to trial.

FIFTH AMENDMENT RIGHTS OF WITNESS
At trial, Kinkennon called as a witness Caroline Callaghan, a woman who was living with Kinkennon at the time the police executed the search. Prior to Callaghan's testimony, the trial judge instructed Callaghan that if she believed the testimony she was about to give would incriminate her, she was "at liberty not to testify" and could "invoke her Fifth Amendment right." She was further instructed that her testimony could be used against her and that if she chose to begin testifying, she would have to complete her testimony. Callaghan *442 stated that she understood and chose to testify.
Callaghan then testified and admitted on direct examination to, among other things, using methamphetamine. On cross-examination, the State asked Callaghan how long she had been an intravenous drug user. Callaghan responded by stating, "I plead the Fifth on that." The State moved to have all of Callaghan's testimony stricken. After briefly discussing the issue with counsel, the court asked Callaghan if she would like to talk to a lawyer before continuing with her testimony, at which point Callaghan responded, "Yes, sir."
Following a short recess, the court reconvened. Callaghan was instructed that the State had a right to cross-examine her as to the testimony she had already given and that she had to answer, but that on unrelated issues, she might be allowed to assert her Fifth Amendment right. Callaghan was told she could confer with her counsel before answering questions. She was also told that if she was instructed to answer a question, but refused, she could be remanded to custody until she complied, or her related testimony could be stricken.
Neither the State nor counsel for Kinkennon raised any objection to this procedure. Callaghan was cross-examined and did not assert her Fifth Amendment privilege, nor did counsel for Kinkennon object during cross-examination of Callaghan.

SENTENCING
Following the bench trial, the district court convicted Kinkennon of one count of possession of methamphetamine with the intent to deliver and one count of knowingly or intentionally possessing cocaine. The matter proceeded to sentencing. The pre-sentence investigation report indicated that Kinkennon has a lengthy criminal history including, among other things, multiple convictions for assault and possession of marijuana. Kinkennon was sentenced to 8 to 12 years' imprisonment for possession of methamphetamine with the intent to deliver and to a concurrent term of 20 months' to 5 years' imprisonment for possession of cocaine. Kinkennon appealed.

ASSIGNMENTS OF ERROR
Kinkennon assigns, restated, that the district court erred in (1) failing to appoint a special prosecutor, (2) improperly informing Callaghan of the manner and scope of her right to assert her Fifth Amendment privilege, and (3) imposing excessive sentences.

STANDARD OF REVIEW
A motion for the appointment of a special prosecutor is addressed to the discretion of the trial court, and absent an abuse of discretion, a ruling on such a motion will not be disturbed on appeal.[3]
A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court.[4]

ANALYSIS

APPOINTMENT OF SPECIAL PROSECUTOR
Kinkennon contends that the district court erred in denying his motion for appointment of a special prosecutor. Specifically, Kinkennon argues that when the Buffalo County Attorney's office hired Schweitzer, a conflict of interest arose because Schweitzer, before joining the county *443 attorney's office, was formally employed as an associate for Yeagley Swanson Murray, the firm that is presently representing Kinkennon. Kinkennon claims that to avoid the "appearance of impropriety,"[5] this conflict of interest should be imputed to the other prosecutors in the office, thus disqualifying the entire Buffalo County Attorney's office.
We have not previously addressed whether an entire prosecutor's office should be disqualified when one attorney, after joining the prosecutor's office, is alleged to have been involved in the representation of a defendant on charges being prosecuted at the time the attorney joined that office. Several other jurisdictions, however, have considered this issue. A few courts have followed a per se rule of disqualification where the mere appearance of impropriety is enough to warrant disqualification of an entire prosecuting office.[6] In cases where such rule was followed, screening the attorney at issue to remedy the imputed conflict is generally not allowed and disqualification of the office is required, irrespective of whether confidences were breached or prejudice to the defendant resulted.[7] Courts that employ this approach reason that a per se rule is required because it eliminates any appearance of impropriety and preserves public confidence in the criminal justice system.[8]
However, the overwhelming majority of courts to have considered this issue have rejected this type of per se rule. Instead, most courts have adopted a less stringent rule, pursuant to which the trial court evaluates the circumstances of a particular case and then determines whether disqualification of the entire office is appropriate.[9] Under this approach, courts consider, among other things, whether the attorney divulged any confidential information to other prosecutors or participated in some way in the prosecution of the defendant.[10] The prosecuting office need not be disqualified from prosecuting the defendant if the attorney who had a prior relationship with the defendant is effectively isolated from any participation or discussion of matters concerning which the attorney is disqualified.[11] If impropriety is found, however, the court will require recusal of the entire office.[12]
We agree with the majority view and do not adopt a per se rule of disqualification. *444 We believe the ultimate goal of maintaining both public and individual confidence in the integrity of our judicial system can be served without resorting to such a broad and inflexible rule. As declared by the Maryland Court of Appeals, "`[t]he appearance of impropriety alone is "simply too slender a reed on which to rest a disqualification order except in the rarest of cases."'"[13]
And we recently endorsed a more flexible rule by adopting the Nebraska Rules of Professional Conduct. Rule 1.11(d),[14] which addresses conflicts of interest for current government officers and employees, provides in relevant part that "[e]xcept as law may otherwise expressly permit, a lawyer currently serving as a public officer or employee: ... (2) shall not: (i) participate in a matter in which the lawyer participated personally and substantially while in private practice or nongovernmental employment."
The official comment 2 to rule 1.11 explains that "[b]ecause of the special problems raised by imputation within a government agency, paragraph (d) does not impute the conflicts of a lawyer currently serving as an officer or employee of the government to other associated government officers or employees, although ordinarily it will be prudent to screen such lawyers." This rule recognizes the distinction between lawyers engaged in the private practice of law, who have common financial interests, and lawyers in a prosecutor's office, who have a public duty to seek justice, not profits.[15]
The per se rule would result in the unnecessary disqualification of prosecutors where the risk of a breach of confidentiality is slight, thus needlessly interfering with the prosecutor's performance of his or her constitutional and statutory duties.[16] Furthermore, a per se rule would unnecessarily limit mobility in the legal profession[17] and inhibit the ability of prosecuting attorney's offices to hire the best possible employees because of the potential for absolute disqualification in certain instances.[18]
We recognize that complete disqualification of a prosecutor's office may be warranted in cases where the appearance of unfairness or impropriety is so great that the public trust and confidence in our judicial system simply could not be maintained otherwise. Such an extreme case might exist, even where the State has done all in its power to establish an effective screening procedure precluding the individual lawyer's direct or indirect participation in the prosecution.[19] But when the disqualified attorney is effectively screened from any participation in the prosecution of the defendant, the prosecutor's office may, in general, proceed with the prosecution.
Whether the apparent conflict of interest justifies the disqualification of other members of the office is a matter committed *445 to the discretion of the trial court.[20] In exercising that discretion, the court should consider all of the facts and circumstances and determine whether the prosecutorial function could be carried out impartially and without breaching any of the privileged communications. A flexible, fact-specific analysis will enable a trial court to protect a criminal defendant from the due process concerns at issue, while at the same time avoiding unnecessary disqualifications of government attorneys. Whether the State has established an effective screening procedure will obviously be part of that analysis.
What constitutes an effective screening procedure will depend on the particular circumstances of each case. However, at a minimum, the disqualified lawyer should acknowledge the obligation not to communicate with any of the other lawyers in the office with respect to the matter. Similarly, the other lawyers in the office who are involved with the matter should be informed that the screening is in place and that they are not to discuss the matter with the disqualified lawyer.
Depending on the circumstances, additional screening procedures may be appropriate. These procedures may include a written undertaking by the screened lawyer to avoid any communication with other lawyers in the office and contact with files or other materials relating to the matter, notice and instructions to all relevant governmental office personnel forbidding any communication with the screened lawyer relating to the matter, denial of access by the screened lawyer to files or other materials relating to the matter, and periodic reminders of the screen to the screened lawyer and other government personnel.[21] In order to be effective, screening procedures must be implemented as soon as practical after a lawyer or government office knows or reasonably should know that screening is needed.[22]
Having rejected Kinkennon's argument that the entire Buffalo County Attorney's office should have been, per se, disqualified, we must determine whether, under the particular facts of this case, it should have been. Based on the affidavits submitted by the parties, it is unclear exactly what, if any, information Schweitzer acquired relating to Kinkennon's case before she joined the county attorney's office.
We conclude, however, that even assuming Schweitzer had acquired some limited knowledge of Kinkennon's case, there is nothing in the record to suggest, nor does Kinkennon allege, that any of this information was communicated by Schweitzer to the county attorney's office to aid in the prosecution of this case. Nor is there any evidence in the record to indicate that Kinkennon's defense was prejudiced, or even affected, by Schweitzer's employment with the county attorney's office. Given the record before us, we cannot conclude that the district court abused its discretion in denying Kinkennon's motion for appointment of a special prosecutor.

FIFTH AMENDMENT PRIVILEGE
Kinkennon argues that the district court committed reversible error by failing to properly instruct the defense witness, Callaghan, of her rights under the Fifth Amendment. Kinkennon claims that the district court "essentially scared [Callaghan] *446 away from feeling that she had the power to exercise her constitutional rights under the circumstances."[23]
This argument fails for two reasons. First, Kinkennon did not object during trial to what he now assigns as error on appeal. It is well established that failure to make a timely objection waives the right to assert prejudicial error on appeal.[24] Second, and more importantly, Kinkennon lacks standing to challenge the alleged violation of Callaghan's rights under the Fifth Amendment. The Fifth Amendment right to be free from self-incrimination is a personal right of the witness.[25] And the personal nature of this right precludes Kinkennon from claiming a Fifth Amendment violation on Callaghan's behalf.[26] Accordingly, this assignment of error is without merit.

EXCESSIVE SENTENCES
For his remaining assignment of error, Kinkennon argues that his sentences were excessive and that the district court failed to properly consider the factors relevant to his sentencing.
When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime.[27] Kinkennon's presentence investigation report reveals an extensive criminal record including, among other things, convictions for multiple assaults, issuing bad checks, possession of drug paraphernalia, carrying a concealed weapon, reckless driving, and possession of marijuana. At sentencing, the court explained that "[t]he information provided by [Kinkennon] indicates that [he] is really not even coming to the threshold of understanding or being of a mindset that he really truly seeks a rehabilitative program." We agree with this assessment.
Possession of methamphetamine with intent to deliver is a Class II felony,[28] punishable by a minimum of 1 year's imprisonment and a maximum of 50 years' imprisonment.[29] Possession of cocaine is a Class IV felony,[30] punishable by a maximum of 5 years' imprisonment, a $10,000 fine, or both.[31] The district court reviewed the record, considered the appropriate sentencing factors, and imposed sentences within the statutory limits. Based on our review of the record, we conclude that the district court did not abuse its discretion in sentencing Kinkennon.

*447 CONCLUSION
For each of the foregoing reasons, the judgment of the district court is affirmed.
AFFIRMED.
NOTES
[1] See Neb.Rev.Stat. § 28-416(1)(a) (Cum. Supp. 2006).
[2] See § 28-416.
[3] See, State v. El-Tabech, 225 Neb. 395, 405 N.W.2d 585 (1987); State v. Bruna, 12 Neb. App. 798, 686 N.W.2d 590 (2004).
[4] State v. Archie, 273 Neb. 612, 733 N.W.2d 513 (2007).
[5] Brief for appellant at 10.
[6] See. State v. Ross, 829 S.W.2d 948 (Mo. 1992); People v. Stevens, 642 P.2d 39 (Colo. App.1981).
[7] See id.
[8] See id.
[9] See, U.S. v. Goot, 894 F.2d 231 (7th Cir. 1990); United States v. Caggiano, 660 F.2d 184 (6th Cir.1981); Hart v. State, 62 P.3d 566 (Wyo.2003); Matter of R.B., 583 N.W.2d 839 (S.D.1998); State v. Dambrell, 120 Idaho 532, 817 P.2d 646 (1991); State v. Camacho, 329 N.C. 589, 406 S.E.2d 868 (1991); Frazier v. State, 257 Ga. 690, 362 S.E.2d 351 (1987); State v. Bunkley, 202 Conn. 629, 522 A.2d 795 (1987); State v. McKibben, 239 Kan. 574, 722 P.2d 518 (1986); State v. Fitzpatrick, 464 So.2d 1185 (Fla.1985); Young v. State, 297 Md. 286, 465 A.2d 1149 (1983); Collier v. Legakes, 98 Nev. 307, 646 P.2d 1219 (1982); State v. Tippecanoe County Court, 432 N.E.2d 1377 (Ind.1982); State v. Cline, 122 R.I. 297, 405 A.2d 1192 (1979); State v. Bell, 346 So.2d 1090 (La. 1977); Upton v. State, 257 Ark. 424, 516 S.W.2d 904(1974).
[10] See, e.g., State ex rel. Romley v. Superior Court, 184 Ariz. 223, 908 P.2d 37 (Ariz.App. 1995).
[11] See, e.g., State v. McKibben, supra note 9; Young v. State, supra note 9; State v. Cline, supra note 9; State v. Pennington, 115 N.M. 372, 851 P.2d 494 (N.M.App.1993).
[12] See State v. Stenger, 111 Wash.2d 516, 760 P.2d 357 (1988).
[13] Young v. State, supra note 9, 297 Md. at 294, 465 A.2d at 1153.
[14] Neb. Ct. R. of Prof. Cond. 1.11(d) (rev. 2005).
[15] See, United States v. Caggiano, supra note 9; State v. Camacho, supra note 9; State v. Stenger, supra note 12; Frazier v. State, supra note 9; State v. Tippecanoe County Court, supra note 9.
[16] State v. Camacho, supra note 9; Lux v. Com., 24 Va.App. 561, 484 S.E.2d 145 (1997).
[17] See Young v. State, supra note 9.
[18] State v. Pennington, supra note 11.
[19] See Collier v. Legakes, supra note 9.
[20] See, State v. El-Tabech, supra note 3; State v. Bruna, supra note 3.
[21] See Neb. Ct. R. of Prof. Cond. 1.0(k) and comment 9 (rev. 2005).
[22] See id., comment 10.
[23] Brief for appellant at 10.
[24] Shipler v. General Motors Corp., 271 Neb. 194, 710 N.W.2d 807 (2006).
[25] State v. Perea, 210 Neb. 613, 316 N.W.2d 312 (1982). See, also, United States v. Nobles, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); Couch v. United States, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973).
[26] See State v. Perea, supra note 25.
[27] State v. Marrs, 272 Neb. 573, 723 N.W.2d 499 (2006).
[28] § 28-416(2).
[29] Neb.Rev.Stat. § 28-105(1) (Cum. Supp. 2006).
[30] § 28-416(3).
[31] § 28-105(1).